**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4921

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEPHONZE PHILLIP BLAKENEY,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge. (8:17-cr-00559-PX-1)

Argued: November 13, 2019                          Decided: February 6, 2020

Before MOTZ, DIAZ, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Harris wrote the opinion, in which Judge Motz and Judge Diaz joined.

**ARGUED:** Cullen Oakes Macbeth, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Hollis Raphael Weisman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

PAMELA HARRIS, Circuit Judge:

Stephonze Blakeney was driving on a federal parkway in Maryland when he lost control of his car and crossed a raised median into oncoming traffic, causing a crash in which his passenger died. After he was indicted for offenses including vehicular homicide while impaired by alcohol, Blakeney moved to suppress evidence obtained from two searches conducted pursuant to search warrants: a toxicology analysis of blood drawn from Blakeney just after the accident, and a review of his car's event data recorder. The district court denied Blakeney's suppression motions, finding that the warrant applications established probable cause and that the search warrants were sufficiently particularized. And in any case, the district court noted, the officers had acted in objective good-faith reliance on the search warrants, making the evidence admissible under *United States v. Leon*, 468 U.S. 897 (1984). We agree with the district court in all respects and thus affirm Blakeney's convictions.

## I.

### A.

The fatal accident giving rise to this case occurred on June 5, 2017.[1] Late that evening, Stephonze Blakeney was driving westbound on Suitland Parkway in Prince George's County, Maryland, just outside of the District of Columbia. He had one

---

[1] The basic facts of this case, which we recount based on the evidence and testimony presented at trial, are not disputed.

passenger in his car, Briaunna Smith. Both had been drinking earlier that evening. As Blakeney approached the District of Columbia, he passed an on-ramp where traffic merged onto the parkway. Near this gradually curving portion of the parkway, Blakeney lost control of his car, which veered sharply to the left. As Blakeney attempted to regain control, his car began to swerve, twice hitting the raised concrete median that divides traffic on the parkway. Eventually, Blakeney's car crossed the median into eastbound traffic and struck a Nissan Altima operated by Milian Moreno.

Fire department and emergency medical services ("EMS") personnel, as well as the United States Park Police ("USPP"), responded to the scene of the accident just after 10:30 PM. The first USPP officer to arrive, Donald Greulich, bore witness to a catastrophic scene: the front end of Blakeney's car, including its engine, had completely separated from the rest of the vehicle; Moreno was lying in the roadway, injured; Smith was in the passenger seat of what remained of Blakeney's car, unresponsive; and Blakeney sat in the driver's seat of his car, staring blankly. EMS personnel declared Smith deceased at the scene at 10:53 PM. Moreno was transported to a hospital where he ultimately recovered from his injuries.

When EMS personnel attempted to free Blakeney from his crumpled car, he became combative and resisted their efforts. The EMS workers told Officer Greulich that Blakeney appeared to be under the influence of alcohol and PCP. After the team was able to place Blakeney into an ambulance, Greulich called USPP detectives to the scene to complete a crash investigation, following standard USPP practice for cases in which a crash causes a fatality.

3

Sergeant Robert Steinheimer of the USPP arrived at 11:00 PM and took control of the investigation. While taking in the scene, Steinheimer "detected a strong odor of an alcoholic beverage, emanating from the passenger compartment" of Blakeney's car. J.A. 27. In light of the severity and fatal nature of the crash, as well as his belief that evidence might be lost if not seized promptly, Steinheimer sought a telephonic search warrant from the District of Maryland's then-on-duty magistrate judge, the Honorable Timothy Sullivan. Coordinating with the United States Attorney's Office for the District of Maryland, Steinheimer reached Judge Sullivan by phone at 12:23 AM to procure the first of the two search warrants at issue in this case.

The contents of the call between Sergeant Steinheimer and Judge Sullivan, which was recorded and later transcribed, are especially important because they function both as the first search warrant application and the first search warrant itself. At the outset of the call, Steinheimer identified himself as the warrant applicant and Blakeney as the subject of the prospective search warrant. Prompted by Judge Sullivan to provide the probable cause supporting issuance of a search warrant, Steinheimer described the accident and the fatality involved, stated that Blakeney had been removed from the driver's seat of his car "with a heavy odor of alcohol and possibly PCP," and reported that Blakeney had been "combative" and "had to be restrained" in order for EMS personnel to address his injuries. J.A. 48–49. Judge Sullivan then asked whether anyone at the hospital had sought Blakeney's "consent to a test to determine alcohol." J.A. 49. Informed that Blakeney was still combative at the hospital and not assisting investigators, Judge Sullivan then stated:

4

Okay. I find that there is probable cause to justify the issuance of the warrant for the drawing of the blood of Mr. Blakeney, Stephonze Phillip Blakeney, as described earlier in this proceeding. It is 12:28 AM and based on the information communicated to me, I believe that there is probable cause at this time to draw his blood. And it is 12:29, all right.

J.A. 49. The conversation lasted for approximately six minutes.

Once the magistrate judge had approved a blood draw, another USPP officer, Sergeant Hamel Morris, went to the hospital where Blakeney had been taken. At 12:44 AM, he witnessed a nurse perform the blood draw, and took the blood sample into USPP custody. A toxicology test later performed by the Office of the Chief Medical Examiner for the District of Columbia revealed that Blakeney's blood at the time of the blood draw contained 0.07 grams of ethanol per 100 milliliters of blood – a high enough concentration, a toxicologist later would testify at trial, to impair psychomotor functions and delay reaction times.

After the on-scene investigation was completed, the crashed cars were towed to the USPP's impound garage, located in the District of Columbia. Three weeks after the accident, Steinheimer applied for the second warrant at issue on appeal. This application, filed in the Superior Court of the District of Columbia, sought authorization to search the event data recorder ("EDR") – an instrument similar to the "black box" often used in plane-crash investigations – in Blakeney's car for information about the car's speed, brake status, and other conditions in the moments just before the crash. Steinheimer's supporting affidavit specified Blakeney's car as the place to be searched and the EDR, along with its data – which would cover the time of the crash and the five seconds just before the crash – as the items to be seized. The affidavit described how Blakeney's car had "crossed over

5

the raised, curb, center median and struck [Moreno's] Nissan," causing a "motor vehicle crash, with injuries," J.A. 100, and explained that the EDR's data was "needed by the crash reconstructionist to determine the underlying cause of the crash," J.A. 101.

The EDR search warrant was approved, and executed by Steinheimer and two other officers. Using the EDR data, a crash reconstructionist determined that Blakeney had been traveling at least 79 miles per hour in the five seconds before his vehicle struck Moreno's Nissan, and that the car's automatic braking system had slowed the car down to 68 miles per hour at the moment of impact. The posted speed limit on the parkway was 45 miles per hour.

On October 23, 2017, a federal grand jury indicted Blakeney on three charges related to the crash: homicide by motor vehicle while impaired by alcohol, driving without a license, and reckless driving.

**B.**

Before trial, Blakeney filed the two suppression motions that are at issue in this appeal. The first challenged the telephonic blood-draw warrant obtained at the scene of the accident and sought suppression of the results of the blood-toxicology test that followed. Blakeney's primary argument was that the warrant was issued without the requisite probable cause. According to Blakeney, Steinheimer recklessly misled the magistrate when he said that Blakeney had been removed from his car "with a heavy odor of alcohol and possibly PCP"; in fact, no USPP officer had smelled PCP (rather than relying on secondhand information from EMS personnel), and Steinheimer smelled alcohol only in Blakeney's car and not on his person. Once those misleading representations were

6

stricken from the warrant application pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), Blakeney finished, there was not enough to establish probable cause that the blood draw would reveal evidence of a crime. Blakeney also challenged the blood-draw warrant as insufficiently particularized, arguing that the magistrate's oral authorization failed to specify the evidence to be seized by "reference to a particular offense." J.A. 20.

Blakeney's second motion raised similar challenges to the admissibility of the evidence obtained from his car's EDR. He argued that Steinheimer's affidavit failed to establish probable cause to believe that the EDR contained evidence of a crime, describing nothing more than a car accident and providing no information about its cause. Blakeney also contended that like the blood-draw warrant, the EDR warrant was insufficiently particularized because it failed to refer to the specific criminal offense as to which evidence was sought.

The district court orally denied both of Blakeney's motions at a pre-trial hearing. With respect to Blakeney's first motion, the district court assumed, only for the sake of argument, that Sergeant Steinheimer recklessly misled the magistrate judge under *Franks*. But correction for any misstatement would make no difference to the probable cause calculus, the court concluded. Even shorn of any reference to an odor of PCP and with clarification that the odor of alcohol emanated from Blakeney's vehicle rather than from Blakeney himself, the warrant application was sufficient: Taken together, Steinheimer's description of the accident and of the "significant driver error" that caused it, the odor of alcohol from inside Blakeney's car, and Blakeney's combativeness were enough to establish probable cause for the blood-draw warrant. J.A. 159. The district court also

7

found that the warrant described the evidence to be seized with the requisite particularity, because it was "plain" from the conversation that what was authorized was a "blood draw" in connection with "a possible DUI-related crash." J.A. 148. Finally, the district court held in the alternative that even if the warrant was defective, suppression would not be appropriate under *United States v. Leon*, 468 U.S. 897 (1984), because USPP officers had obtained the blood-alcohol evidence in objectively reasonable reliance on the warrant.

Next, the district court denied Blakeney's motion to suppress the data obtained through the EDR warrant. As to probable cause, the district court found that the warrant application did more than describe a traffic accident, as Blakeney would have it; instead, the description of the severity of the accident and the significance of the driver error involved took the warrant application "out of the realm of just a garden-variety car accident" and "into probable cause to believe that an offense has been committed." J.A. 173. The district court also addressed Blakeney's argument that the warrant failed to describe the items to be seized with sufficient particularity because it did not specify the offense Blakeney was thought to have committed. The district court found that it was clear from the warrant that "the crime at issue is death by car." *Id.* And in any event, the district court concluded, the warrant did describe the items to be seized with specificity: It was "particularized to certain devices" – the EDR in Blakeney's car – that would have evidence relevant to the accident. *Id.* Finally, the court again noted that the USPP officers had relied on the warrant in objective good faith. The district court later denied a motion for reconsideration of its decision.

8

Blakeney went to trial on the charges against him. Kathryn DiPalma, an expert for the government, testified that the EDR data showed that Blakeney had been travelling at approximately 68 miles per hour – well in excess of the 45-mile-per-hour limit – at the moment his car struck Moreno's Nissan, a factor she described as a cause of the crash. Blakeney's expert witness, Wendell Cover, agreed with DiPalma's technical assessment of the EDR data, but pointed to evidence from the crash scene to argue that the car crash had been caused by "over-steering" in response to a hazard rather than Blakeney's speed. J.A. 591. Another expert witness for the government, Lucas Zarwell, testified regarding the blood-toxicology results obtained through the blood-draw warrant. While he acknowledged that a blood-alcohol content of 0.07% is "not extremely high," he explained that an individual with such a concentration would have delayed reactions and suffer from impaired judgment. J.A. 485–86.

The jury convicted Blakeney on all three counts. The district court sentenced Blakeney to a total of 40 months' imprisonment: 36 months for homicide by motor vehicle while impaired by alcohol, and four concurrent months' imprisonment for driving without a license and reckless driving.

Blakeney filed a timely notice of appeal on November 29, 2018.

**II.**

On appeal, Blakeney challenges the two search warrants that authorized the drawing and analysis of his blood and the review of his car's EDR data. As he did before the district court, Blakeney argues that Steinheimer's applications for the blood-draw and EDR

9

warrants failed to establish probable cause, and that the search warrants themselves lacked particularity in their descriptions of the items to be seized. It follows, he argues, that the evidence obtained under the search warrants – the blood-toxicology screen results and the EDR data – must be suppressed. And without this evidence, Blakeney claims his convictions for homicide by motor vehicle while impaired by alcohol and reckless driving cannot stand and must be vacated.

We disagree. We review de novo the legal determinations that underpin a district court's suppression rulings. *See United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). Like the district court, we hold that the two search warrants at issue were supported by probable cause and were sufficiently particularized. And in any event, we conclude, suppression would be inappropriate under *Leon* because the officers relied in objective good faith on the search warrants to obtain the evidence in question.

**A.**

We begin with the question of probable cause, without which a search warrant may not issue. *See* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause . . . ."). Whether probable cause for a search exists is a "practical, common-sense" question, asking whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is "not a high bar," and officers "need not rule out a suspect's innocent explanation" in order to obtain a warrant. *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)) (internal quotation marks omitted). We review a magistrate judge's decision to issue a search warrant with

10

"great deference," asking only "whether the judicial officer had a 'substantial basis' for finding probable cause." *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (quoting *Gates*, 462 U.S. at 236–38). And even if a search warrant later is determined to lack probable cause, the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith. *Leon*, 468 U.S. at 922–23; *United States v. Thomas*, 908 F.3d 68, 72–73 (4th Cir. 2018).

In finding that the blood-draw warrant was supported by probable cause, the district court here relied on three key facts: "gross driver error" by Blakeney that resulted in a fatal crash; an odor of alcohol coming from Blakeney's car; and Blakeney's combativeness with first responders on the scene. J.A. 152, 159. Like the district court, we find that these facts, taken together, are sufficient to establish probable cause to search for evidence of alcohol intoxication.

Blakeney's chief contention is that probable cause to believe that a person is driving under the influence of alcohol ordinarily requires more than the simple fact of a car accident. *See Cuvo v. De Biasi*, 169 F. App'x 688, 690 (3d Cir. 2006) (finding of probable cause requires "some evidence independent of the accident itself"). But the warrant application in this case described much more than a routine traffic accident. First, as the district court explained, there was the severity of the driver error described in the warrant application: "[J]umping the median isn't a small thing. It's not just weaving over the solid line . . . ." J.A. 152. "[J]umping the median and crashing headlong into someone else," the district court reasoned, is a factor that may contribute to probable cause of an impaired driver. *Id.*

11

And the district court did not rely on severity alone. Instead, it viewed the driver error described in the warrant application in tandem with the "odor of alcohol coming from the vehicle." *Id.* Recognizing, perhaps, the common-sense link between the smell of alcohol at the scene of an accident and a suspicion of driving under the influence, Blakeney focuses much of his argument on this point. According to Blakeney, because the smell of alcohol was associated with the car rather than his person – and was detected only after he had been removed from the scene by ambulance – it was at least as likely to signify that his passenger had been drinking as it was to indicate his own intoxication. But as the district court explained, these two scenarios are not "dichotomous variable[s]": "[I]f the passenger has been drinking, too, it doesn't mean that the driver hasn't." J.A. 153. An officer who smells alcohol in the passenger compartment of a now-crashed car in which two people have been driving reasonably may infer that either or *both* individuals were drinking at the time of the crash. *See Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (presence of illegal drugs in car with three occupants gives rise to probable cause that "any or all three" of the occupants are involved in criminal activity, "either solely or jointly").

Finally, there was Blakeney's combativeness at the scene of the accident. Blakeney argues that even if the warrant application established a fair probability that he had been drinking, it did not establish that he had consumed enough alcohol to become intoxicated or impaired. But in combination with the severity of Blakeney's driving error, the district court found, the fact that Blakeney was described as "combative" and "had to be restrained for care [to be] provided by EMS" was enough to "undermine[] any inference that Mr. Blakeney's conduct could be considered [that] of someone sober." J.A. 159.

12

At bottom, Blakeney's argument is that "[c]ar accidents – whether minor or severe – occur for all kinds of reasons unrelated to alcohol-induced negligence," and that the warrant application here failed to "rule out" alternative explanations, such as mechanical failure, for this accident. Br. of Appellant at 24. But this misapprehends the probable cause standard, which requires only the kind of "fair probability on which reasonable and prudent people, not legal technicians," would rely, *Florida v. Harris*, 568 U.S. 237, 244 (2013) (alterations, citation, and internal quotation marks omitted), and does *not* require an affiant to rule out all innocent explanations for suspicious facts before seeking a warrant, *Wesby*, 138 S. Ct. at 588. We agree with the district court that taken together, the facts known to Steinheimer and conveyed to the magistrate judge in this case established a "fair probability," *Gates*, 462 U.S. at 238, that Blakeney's blood would contain evidence that he was driving under the influence of alcohol at the time of the accident.

Under the same practical standard and for many of the same reasons, we conclude that the application for the EDR warrant likewise provided the judge who approved that warrant with a "substantial basis" for finding probable cause. *Id.* at 236–38. Again, the thrust of Blakeney's argument is that the warrant application did no more than establish a fatal traffic accident, which can occur without any criminal conduct. But again, as the district court explained, this warrant application describes not a "garden-variety car accident," but instead "specific steps" taken by Blakeney, as the driver, to "cross over a center median, [a] raised curb, [and] strike another vehicle head-on." J.A. 173; *see also id.* at 168 (assessing significance of driver error required "to cross over a parkway . . . with

13

more than one lane and traffic going at 50, 55 miles an hour . . . cross[] over a median, a raised median, go[] from that person's lane, over the hump, and into the other lane"). And again, the possibility that driver error of the same magnitude might have occurred without giving rise to a criminal offense is not enough to negate probable cause. *See Bosyk*, 933 F.3d at 325. Like the district court, we think that the description of the accident provided in the warrant application was enough to "take this from the world of accidents in tort law into probable cause to believe that an offense has been committed," J.A. 173, and that relevant evidence would be discovered in the EDR data from the five seconds before the crash.

Finally, we note that even if either or both of the warrant applications had failed to establish probable cause, Blakeney still would not be entitled to suppression of the evidence in question – the results of the toxicology screen of his blood and the EDR data – and so there would be no reason to revisit his convictions. Under *Leon*'s "good faith" exception to the suppression remedy for a Fourth Amendment violation, evidence will not be suppressed if it is obtained by police officers in objectively reasonable reliance on a search warrant, even if that warrant later is determined to be invalid. 468 U.S. at 922–23; *see also Thomas*, 908 F.3d at 72–73. Here, even if we were to assume, for the sake of argument, an absence of probable cause, neither of these warrant applications could be said to be "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (citation and internal quotation marks omitted). For that reason alone, Blakeney cannot prevail on his motion to suppress for lack of probable cause.

14

**B.**

We turn now to Blakeney's particularity challenge to the search warrants. The Fourth Amendment requires not only that warrants be based on probable cause, but also that they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Unlike the probable cause requirement, which concerns the showing made by an officer *seeking* a search warrant, the particularity requirement is focused as well on the officer *executing* a warrant, and ensures that the search "will be carefully tailored to its justifications" rather than becoming a "wide-ranging exploratory search[]" of the kind the "Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Accordingly, what "particularity" demands in this context is that the executing officer reasonably can ascertain and identify from the warrant the place to be searched and the items to be seized. *See United States v. Owens*, 848 F.2d 462, 463 (4th Cir. 1988); *see also United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (particularity requirement satisfied when "the description of the items leaves nothing to the discretion of the officer executing the warrant").

Blakeney argues that the blood-draw and EDR warrants both failed to satisfy this particularity requirement. Before the district court and on appeal, he has consistently pressed one claim: that particularity requires a search warrant to specify the "particular crime" of which officers are to seek evidence. Br. of Appellant 32. According to Blakeney, the search warrants did not do so here, and, as a result, the evidence obtained from his blood and the EDR must be suppressed. We disagree.

15

First, like the district court, we conclude that the warrant applications in this case in fact did describe, to a reasonable degree of specificity, the crimes for which evidence was sought. When it comes to particularity, we construe search warrants in a "commonsense and realistic" manner, avoiding a "hypertechnical" reading of their terms. *Williams*, 592 F.3d at 519 (citations and internal quotation marks omitted). Here, as the district court explained, the full context of the conversation between Sergeant Steinheimer and the magistrate judge, transcribed and memorialized as both the blood-draw warrant application and the warrant itself, made "plain" that the officers were authorized to search for evidence in connection with the offense of driving under the influence – "a possible DUI-related" offense. J.A. 148. And the EDR warrant, as the district court found, is properly construed as having "communicated" that the relevant offense was "a vehicular homicide or a vehicular-related fatality." J.A. 164. It is true, as the district court recognized, that those offenses come in more specific "stripes," ranging from voluntary manslaughter to reckless driving, "DUI or not DUI." *Id.* But for purposes of a search of a vehicle EDR, those differences are beside the point; so long as the executing officers know they are to search the EDR data only for evidence related to "a vehicular homicide or a vehicular-related fatality," J.A. 164, the concerns underlying the particularity requirement – the avoidance of "exploratory rummaging" and general searches, *Williams*, 592 F.3d at 519 (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)) (internal quotation marks omitted) – are addressed. *See United States v. Dargan*, 738 F.3d 643, 648–49 (4th Cir. 2013) (particularity requirement satisfied where "commonsense reading of the warrant's scope" would exclude "exploratory rummaging" by the executing officers).

16

More fundamentally, we think that the premise of Blakeney's argument – that a search warrant always must specify the crime for which the executing officers may seek evidence – is mistaken. The Fourth Amendment "specifies only two matters that must be particularly described in [a] warrant: the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97–98 (2006) (alterations and internal quotation marks omitted) (warrant need not set out the basis for finding probable cause). Particularity with respect to the criminal activity suspected is not on that list. *See United States v. Horn*, 187 F.3d 781, 787 (8th Cir. 1999). So long as the warrant describes the items to be seized with enough specificity that "the executing officer is able to distinguish between those items which are to be seized and those that are not," *United States v. Dickerson*, 166 F.3d 667, 693 (4th Cir. 1999), *rev'd on other grounds by* 530 U.S. 428 (2000), the particularity standard is met. *See*, *e.g.*, *Dargan*, 738 F.3d at 647–49 (finding a warrant sufficiently particularized because the description of the items to be seized – "[i]ndicia of occupancy, residency, of the premises . . . including but not limited to, utility and telephone bills, [and] canceled envelopes" – was itself sufficiently particularized to "preclud[e] officers from conducting [a] fishing expedition[]" into personal papers).

It is true, as Blakeney points out, that where a warrant does not *otherwise* describe the evidence to be seized, that gap can be filled, at least sometimes, if the warrant instead specifies the relevant offense. In *Dickerson*, for instance, we held that a warrant was sufficiently particularized where it identified the items to be seized only as "[e]vidence of the crime of bank robbery." 166 F.3d at 693–94. Because bank robbery is a "specific illegal activity" that "generates quite distinctive evidence," we held, the warrant's reference

17

to bank robbery made it possible for the executing officers to "identify the property sought with reasonable certainty" – in a way that reference to a broader criminal offense, like "fraud" or "conspiracy," might not. *Id.* at 694; *see also United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986) (warrant authorizing the seizure of documents broadly described – "address books, diaries, business records, documents, receipts" – was sufficiently particularized because it also specified that the documents must be "evidence of a particular crime"). But where a warrant directly describes with specificity "the goods to be seized," *Dickerson*, 166 F.3d at 693 (citation and internal quotation marks omitted), there is no additional requirement that it also set out a particular criminal offense.[2] Indeed, that point is so noncontroversial, *see* Wayne R. LaFave et al., *Criminal Procedure* § 3.4(f) (5th ed. 2009) ("The Fourth Amendment's particularity requirement does not require particularity with respect to the criminal activity suspected."), that Blakeney's counsel embraced it at oral argument, agreeing that a warrant may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal

---

[2] In his brief, Blakeney relies for his contrary argument on an out-of-circuit case, *United States v. George*, 975 F.2d 72 (2d Cir. 1992), which we discussed in our decision in *Dickerson*, *see* 166 F.3d at 693–94. But *George* is wholly consistent with our precedent, under which reference to a particular offense is relevant to the extent it helps to narrow what otherwise would be an unduly broad description of the items to be seized. At issue in *George* was a "broad catch-all phrase" in a warrant, authorizing the seizure of "any other evidence relating to the commission of a crime." *George*, 975 F.2d at 75. Had the warrant specified that the search was being undertaken in connection with the crime of robbery, the court reasoned, then it might be possible to read the catch-all phrase, in context, as authorizing a search only for evidence relevant to robbery. But because the warrant did not specify robbery as the suspected offense, there was nothing on the face of the warrant to "curtail[] the officers' discretion" under the open-ended catch-all phrase. *Id.* at 75–76.

18

offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize.

The warrants at issue here satisfy *both* of those criteria. As the district court found, and as noted above, they refer with adequate specificity to the offenses of which Blakeney was suspected. And they also describe the items to be seized with enough particularity to constrain the discretion of the executing officers and prevent a general search. As the district court explained, the application for the blood-draw warrant and the warrant itself make clear that what was sought and what the magistrate judge authorized was the drawing and testing of Blakeney's blood to determine its alcohol content. *See* J.A. 148 ("[I]t's an application for a blood draw because of a possible DUI-related crash."); *id.* at 159 (magistrate judge approved "obtaining Mr. Blakeney's blood to perform blood alcohol testing").[3] In his part of the conversation, Sergeant Steinheimer reported details about a fatal crash caused by a car operated by Blakeney and described the odor of alcohol at the

---

[3] The district court's review – like ours – might have been simplified had the government complied fully in this case with the rules regarding telephonic warrants. Federal Rule of Criminal Procedure 41(d)(3) authorizes a federal magistrate judge to "issue a warrant based on information communicated by telephone or other reliable electronic means." It also incorporates the record-making requirements of Rule 4.1, which in turn mandate that a telephonic warrant affiant "prepare a proposed duplicate original" of a warrant and "read or otherwise transmit its contents verbatim to the judge." Fed. R. Crim. P. 4.1(b)(3). Here, it appears that no physical warrant or duplicate was prepared, and so we are left to rely on a transcribed telephone conversation for our analysis. Blakeney has not challenged the blood-draw warrant on this basis, and "ministerial" violations of Rule 41 generally do not warrant suppression. *United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000); *see also United States v. Cazares-Olivas*, 515 F.3d 726, 729 (7th Cir. 2008). But the record-making requirements exist for a reason, and a written warrant might have provided some additional clarity in this case.

19

scene. After hearing those details, the magistrate judge asked whether officers had sought

Blakeney's consent for "a test to determine alcohol." J.A. 49. And as soon as Steinheimer

informed him that Blakeney was uncooperative, the magistrate judge authorized "the

drawing of the blood of Mr. Blakeney . . . as described earlier in this proceeding." *Id.*

Construed in a "commonsense manner," *see Dargan*, 738 F.3d at 647, that warrant would

give a reasonable executing officer notice that his or her authority was limited to drawing

Blakeney's blood and testing it to determine alcohol content.[4]

The EDR warrant, on its face, clearly meets the requirement that it describe with

particularity the "things to be seized." U.S. Const. amend. IV. As the district court noted,

that warrant is "particularized to certain devices" – the EDR – that "would have evidence

relevant to" criminal offenses involving a motor-vehicle crash fatality. J.A. 173. The

---

[4] We thus reject Blakeney's argument that the blood-draw warrant lacked particularity because it authorized USPP officers to extract information entirely unrelated to their criminal investigation from Blakeney's blood, "conducting fishing expeditions into [his] private affairs," *see Dargan*, 738 F.3d at 647, by testing for things like HIV status and susceptibility to hereditary diseases. No reasonable officer could have understood the blood-draw warrant to have authorized a search for information with no connection to the accident described by Steinheimer.

Our independent examination of the record does indicate that after Blakeney's blood sample was transferred by the executing officer to the District of Columbia's Office of the Chief Medical Examiner, it was screened not only for alcohol content but also for the presence of certain drugs which might have influenced Blakeney's driving, none of which were detected. J.A. 29, 484. Blakeney did not bring this fact to our attention and has not made it the basis for any argument on appeal. In any event, because the only incriminating evidence revealed in the toxicology report and introduced at trial was Blakeney's blood-alcohol level, which the officers clearly were authorized to obtain, any concern about the scope of the toxicology screen would not be grounds for suppression in this case. *See United States v. Uzenski*, 434 F.3d 690, 708 (4th Cir. 2006); *cf. George*, 975 F.2d at 79 ("[E]vidence seized under the valid portion [of a search warrant] may be admitted.").

warrant described the car to be searched in detail: "a gray[-]colored, 2016 Chrysler 200, 4[-]door, displaying Virginia license plate VKN6572, expiration: 10/17, VIN # 1C3CCCAB4GN132220," stored at a secure facility at 3155 V Street, Northeast, Washington, DC. J.A. 99. It specified the vehicle's EDR, "capable of recording and storing several parameters existing while the vehicle is in motion, at the time of the crash and five seconds prior to the crash," and further described the relevant data as including "diagnostic codes present at the time of crash, headlight status, engine RPM[s], vehicle speed, brake status and throttle position." J.A. 101. No officer executing this warrant could have been mistaken as to the data he was authorized to obtain or the place where he was to find it.

Finally, were there any doubt on this score, we nevertheless would conclude that both the results of the blood-toxicology test and the EDR data were admissible at Blakeney's trial under *Leon*'s good faith exception to the exclusionary rule. *See Dickerson*, 166 F.3d at 693–94 (warrant was sufficiently particularized and even if it were not, suppression would not be required under *Leon*). Even assuming, that is, that the two warrants in question were insufficiently particularized, they were not so "facially deficient" in this respect that an executing officer could not reasonably have presumed them to be valid. *Leon*, 468 U.S. at 923; *see Dickerson*, 166 F.3d at 694. Because the officers relied in objective good faith on the search warrants, Blakeney would not be entitled to suppression even if we believed that those warrants were somehow deficient in their description of the items to be seized.

## III.

For the foregoing reasons, we affirm Blakeney's convictions.

*AFFIRMED*