**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 21-4473**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID SIERRA OROZCO,

Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge.  (5:19-cr-00095-D-1)

─────────────

Argued:  May 5, 2022                                    Decided:  July 25, 2022

─────────────

Before KING and RICHARDSON, Circuit Judges, and KEENAN, Senior Circuit Judge.

─────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge King and Senior Judge Keenan joined.

─────────────

**ARGUED:**  Richard Croutharmel, Raleigh, North Carolina, for Appellant.  Natasha Katherine Harnwell-Davis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, Jacob D. Pugh, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

David Sierra Orozco was paid to drive a car with over $100,000 in drug-tainted cash hidden in a secret dashboard compartment. When police pulled him over, he acted suspiciously: He quickly shut down the GPS application running on his smartphone and struggled to answer where he was going with the money. His odd behavior continued when he arrived at the station: When police found five SD cards wrapped in a $100 bill in Orozco's shoe, Orozco tried to destroy them by eating them. When police got a warrant to search the phone and SD cards, things went from bad to worse for Orozco—both the phone and the chips contained graphic and heinous child pornography.

Orozco contends that the search warrant for the phone and SD cards should not have been issued. And without that warrant, the police would not have found the child pornography he was eventually convicted of possessing. But we conclude that the warrant affidavit presented a substantial basis for believing that Orozco was engaged in drug trafficking, and that Orozco's cellphone and SD cards would contain evidence of that criminal activity. So we affirm his conviction.

## I.    Background

On a summer morning in Harnett County, North Carolina, Corporal Donald Lucas and Deputy Benjamin Winstead each sat in separate patrol cars at the corner of Arrowhead and Chicken Farm Roads. As passing cars slowed down to cross the nearby railroad tracks, the officers checked license plates to identify any outstanding tickets. When a blue Lexus sedan passed, Corporal Lucas ran its plate and found that its registered owner, Pedro Lopez

Gomez, had a suspended driver's license. The two officers began tailing the car and pulled it over after it swerved across the centerline twice.

When they approached the sedan, the driver explained that he did not have a driver's license but provided a Mexican consular ID card identifying himself as David Orozco. Orozco had a Samsung smartphone in his lap displaying a GPS navigation app. When asked where he was headed, Orozco abruptly exited the GPS app but could not come up with an answer to where he was going. After a bit of pressing, Orozco glanced at some nearby fields and apprehensively replied that he was looking for farm work. Lucas noticed that Orozco was "sweating profusely" despite the car's blasting A/C and was shaking nervously. J.A. 82. He also noticed that the dashboard was not flush and bore toolmarks, suggesting someone previously pried it open.

Upon seeing all this, the officers called in a K-9 unit and asked Orozco to get out of the car. While one officer ran Orozco's ID, the other spoke with Orozco, who consented to the car's search. The K-9 arrived and, after alerting to the driver's side door, was placed inside the car. There, it again alerted to the presence of drug residue around the dashboard, near the toolmarks. Officers opened the dashboard's secret compartment and found grocery bags filled with $111,252 in cash. When he saw the cash, Orozco volunteered that he had been paid to drive the car and that the money was not his. Because Lucas suspected that Orozco was engaged in drug-smuggling, he supplied Orozco's phone number to the

3

DEA.[1]  The DEA advised that the number was linked to an ongoing investigation.  The officers took Orozco into custody for driving without a license and failure to maintain lane control.  Officers also retrieved the Samsung phone Orozco was using to navigate, along with a flip-phone that was also in the car.  Later, in a "money line up,"[2] a drug-sniffing dog confirmed the presence of drug residue on the money.  J.A. 150.

At the station, Corporal Robert Kimbrough searched Orozco's person.  He found a folded-up $100 bill in Orozco's shoe, and as he unfolded it, five micro-SD cards fell out onto the floor.[3]  Orozco quickly scooped up two of the cards and shoved them into his mouth.  Kimbrough managed to recover one SD card—though chewed and inoperable—from Orozco's mouth; Orozco apparently swallowed the other.

Based on this information, officers sought a search warrant for the Samsung smartphone and the three operable SD cards.  The application's affidavit included a

---

[1] Orozco gave this phone number to Corporal Lucas during the traffic stop, as contact information while Lucas was filling out the citation.  This phone number does not appear to correspond to the Samsung smartphone that Orozco was using to navigate.  It is unclear whether it corresponds to the flip-phone in Orozco's possession at the time, or perhaps some different phone entirely.

[2] In a money line-up, some cash is placed into a bag, and several identical control bags are filled with things other than the cash.  The K-9 is then paraded past each bag. Here, the K-9 alerted to only the bag containing the money found in Orozco's car.

[3] A micro-SD card is an external storage device used to augment the storage of or transfer files between electronic devices such as cellphones and tablets.  The micro-SD cards found on Orozco were compatible with the Samsung smartphone he was carrying. And the files eventually found on them suggested that they were used with the Samsung smartphone's WhatsApp messaging app.

4

detailed factual recitation, which told the same story that we have told here.[4]  The warrant issued, authorizing a search for "[r]ecords of illegal drug activities, documents, photographs, . . . and other evidence of drug trafficking."  J.A. 39.  Narcotics officers began searching one SD card; they immediately saw what they believed to be child pornography.  A second warrant was then obtained for the SD cards; two SD cards contained several hundred images and videos of child pornography.  A third warrant was then issued for the Samsung smartphone; its internal temporary storage contained five child pornography images.

Orozco was indicted on one count of Possession of Child Pornography, 18 U.S.C. § 2252A(a)(5)(B).  He moved to suppress the images on several grounds, including that the first warrant to search the smartphone and SD cards lacked probable cause.  The district court denied the motion, and following a jury trial Orozco was convicted and sentenced to 12 years in prison.  He timely appealed, and we have jurisdiction.  28 U.S.C. § 1291.

## II.     Discussion

On appeal, Orozco argues that the district court erred by not suppressing evidence found on the SD cards and smartphone.  According to Orozco, the application for the first warrant did not recite facts adequate to establish probable cause that the SD cards contained evidence of drug crimes.  When the district court denies a motion to suppress, we review its legal conclusions de novo and factual findings for clear error.  *United States v. Gondres-*

---

[4] No information about the interoperability of the SD cards and the Samsung smartphone, provided above in note 3, was in the affidavit, so we do not consider it in our analysis.  The affidavit also did not specify the exact amount of money found, explaining only that a "large" sum was discovered in "separate plastic grocery bags."  J.A. 42.

5

*Medrano*, 3 F.4th 708, 713 n.1 (4th Cir. 2021). In doing so, we consider the evidence in the light most favorable to the government, deferring to the reasonable inferences drawn by the local judge and law enforcement officers. *Id.*[5]

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause has long been understood to encompass circumstances that, while less than a preponderance, 'warrant suspicion.'" *Gondres-Medrano*, 3 F.4th at 714 (quoting *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813)). We afford initial probable cause determinations "great deference" when, as here, a "neutral and detached magistrate" finds probable cause to support a warrant. *Illinois v. Gates*, 462 U.S. 213, 236, 240 (1983). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam).

Orozco argues that the warrant application failed to establish probable cause to believe he was involved with drug trafficking and that it failed to show that any drug-trafficking evidence would be found on the SD cards and smartphone. But applying the

---

[5] Below, Orozco disputed some facts in the warrant application. But he concedes that these factual disputes are not pertinent to his challenge on appeal.

appropriately deferential, commonsensical standard of review, we conclude that the warrant passes muster on all counts.[6]

### A.      The affidavit presented a substantial basis for concluding that Orozco was engaged in drug trafficking.

We begin with Orozco's argument that the warrant affidavit did not give cause to believe he was engaged in illegal drug trafficking. Orozco's argument essentially boils down to the idea that it "is not illegal to be paid to drive a car" and that "[c]ash is not contraband." Appellant's Br. 20. This is true. And so, Orozco insists, driving another person's car with a large sum of drug-tainted cash stashed in a secret compartment is not enough evidence of drug-trafficking activity to justify further investigation. There, we disagree.

That Orozco might propose an innocent explanation for his conduct does not defeat probable cause. *See United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) ("[O]fficers need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018))). A search warrant's purpose is to gather evidence necessary to determine whether a crime has been committed, and if so by whom.

---

[6] Because we conclude that the warrant was supported by probable cause, we need not consider the government's fallback good-faith-exception argument. *See United States v. Leon*, 468 U.S. 897, 923 (1984) (holding that evidence obtained from a warrant that lacked probable cause should be suppressed only if it is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part))).

Probable cause is thus "not a high bar." *Id.* Take *United States v. Blakeney*, 949 F.3d 851, 855 (4th Cir. 2020), as an example. There, the suspect driver crossed a concrete highway median, causing a fatal car crash. Investigating officers noticed that the car smelled of alcohol, and Blakeney was behaving belligerently towards them. *Id*. at 855, 860. Arguing that a blood-draw warrant lacked probable cause, Blakeney pointed out that car accidents happen for innocent, non-alcohol-related reasons, that the car might have smelled of alcohol because his passenger had been drinking, and that his belligerent behavior did not necessarily betray drunkenness. *Id.* at 859–60. We rejected these arguments, holding that together the severe accident, alcohol odor, and belligerence established a fair probability that Blakeney was driving under the influence. *Id.* at 860 (noting that the warrant affiant did not need to "rule out all innocent explanations" for that conduct).

Though the crimes at issue differ, *Blakeney* maps onto this case. Like the car accident, being paid to transport money could occur for innocent reasons. But given the "large" amount of money and the way it was stored—wrapped in grocery bags and stashed in a hidden compartment—those innocent explanations seem unlikely. And just as alcohol odor in a passenger cabin need not mean the driver was drinking, we are mindful that a drug dog's alert on cash may not always mean it is drug money.[7] Likewise, Orozco's

---

[7] Some courts have questioned the evidentiary value of a drug dog's alert on cash based on the belief that cash often contains drug residue. *See United States v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00) in U.S. Currency*, 258 F.3d 215, 229–30 (3d Cir. 2001) ("[W]e attach no significance to the evidence derived from the post-seizure dog sniff."). But other courts suggest more recent research tends to show that (Continued)

sweating and nervous behavior when interacting with officers, like Blakeney's combativeness, does not necessarily establish probable cause. *See, e.g.*, *United States v. Massenberg*, 654 F.3d 480, 491 (4th Cir. 2011) (holding that "mild nervousness" is not enough, standing alone, to establish reasonable suspicion of a crime); *cf. Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

But when viewed together, the totality of these circumstances is more than enough to establish a "fair probability" that Orozco was engaged in drug trafficking. *Blakeney*, 949 F.3d at 860 (quoting *Gates*, 462 U.S. at 238). So the officers had probable cause to search Orozco's relevant effects for evidence, so long as they bore some potential connection to the suspected crime. That is where we turn next.

### B. The affidavit presented a substantial basis for concluding that evidence would be found on the SD cards and smartphone.

Probable cause to believe that a person is engaged in criminal activity is not *carte blanche* to search all their personal effects. There must also be some nexus between the

---

drug dogs alert to a byproduct of cocaine, methyl benzoate, that remains present on cash for only short periods. *See United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 460 (7th Cir. 2005) ("[T]he empirical information provided in this case indicates that dog alerts to currency should be entitled to probative weight."); *id.* at 462 ("[T]he very ephemeral nature of the methyl benzoate byproduct of illicit cocaine makes it highly likely that [the] cash hoard was in very close proximity to large amounts of the drug within hours or days of [the dog] alerting to it."). Given our deference to the neutral magistrate judge and her reliance on this evidence as only part of the substantial basis for finding probable cause, we need not fully resolve that dispute here.

9

suspected crime and the place to be searched—"a substantial likelihood that evidence of a crime will be found *in a particular place*." *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011) (emphasis added). As part of the probable-cause inquiry, whether a nexus exists is a "practical, commonsense determination" to be made by the issuing judge. *Id.* And it may be established by "the normal inferences of where one would likely keep" the evidence being sought. *Id.*; *see United States v. Lindsey*, 3 F.4th 32, 39–40 (1st Cir. 2021). So we must consider whether the magistrate judge, looking at the "totality of the circumstances," had a substantial basis for believing that evidence of drug trafficking could be found on the SD cards and phone. *See United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010).

### 1.    SD Cards

We begin with the SD cards, which Orozco hid in a $100 bill inside his shoe. That alone is suspicious and might reveal a connection between those SD cards and Orozco's ongoing criminal conduct. But we need not fret about whether it is by itself suspicious enough to establish probable cause to search the cards. Because after dropping the cards on the ground, Orozco shoved some in his mouth and started chewing, and apparently swallowed one.

Orozco does not argue that chewing memory cards is typical, innocent behavior. Chewing on the chips can be taken only as an attempt to hide something. Orozco just insists that the "something" is not necessarily evidence of his crime. And so, he argues, more was required of the warrant application to tie the SD cards to the crimes for which he was being investigated.

10

Orozco's contentions defy longstanding legal principles. Intentionally destroying an item before it can be examined would permit someone to believe the item is inculpatory. *See Wilson v. United States*, 162 U.S. 613, 621 (1896); 1 Simon Greenleaf, A Treatise on the Law of Evidence § 37, at 42 (Isaac F. Redfield ed., 12th ed. 1866). It is almost tautological that, where an arrestee attempts to destroy evidence, he is trying to prevent that evidence from being seen by police. And where police have probable cause to believe the arrestee is engaged in drug trafficking, the most reasonable inference is that the item relates to that crime. *See United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020) ("The officers had probable cause to believe that the computer seized during the search of Cobb's home contained evidence pertaining to [the victim's] murder—largely because Cobb, within 48 hours of the murder, instructed his parents to remove the computer from his room and clean it because [the victim] had recently used it."). Could someone, hypothetically, destroy evidence because it reveals some embarrassing but innocuous information? Maybe. Or perhaps it might—as it turned out here—be related to some other criminal conduct. But when the suspect is reasonably believed to be engaged in drug trafficking, we find there is an adequate nexus to search the evidence the defendant attempted to destroy.

In resisting this conclusion, Orozco emphasizes that the warrant affidavit does not expressly say that, in the officer's training and experience, drug traffickers tend to keep evidence of drug trafficking on their SD cards (or smartphones). In his view, the affidavit should have said: "In my training and experience, drug dealers keep evidence of their crimes on their micro-SD cards or on their electronic media in general." Oral Arg. 6:25,

11

9:50. Orozco argues that all warrant applications must include the "magic incantation" from the affiant that, "in my training and experience, [there is a nexus between the suspected crime and evidence I want to search]." To put it bluntly, no such requirement exists.

Indeed, a magic-words requirement for warrant affidavits runs headlong into the Supreme Court's clear instruction that we should not add "[t]echnical requirements of elaborate specificity" into the warrant-application process, and "should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than commonsense, manner." *Gates*, 462 U.S. at 235–36 (cleaned up). The affidavit need not dot every "i," cross every "t," or (as Orozco suggests) "close" every inferential "loop." *See* Oral Arg. 17:25–17:31. It "need not directly link the evidence sought with the place to be searched." *United States v. Jones*, 942 F.3d 634, 639 (4th Cir. 2019). It need only supply enough facts for a neutral magistrate, who may make reasonable inferences to fill in any logical gaps, to find the required nexus. *See id.* at 639–40.

Here, Orozco's attempt to destroy the SD cards provided a substantial factual basis that allowed the magistrate to reasonably infer that the SD cards contained evidence that Orozco was trafficking drugs. So the warrant was properly issued.

### 2.    Smartphone

Next, we must determine whether there is a basis for finding probable cause to search Orozco's smartphone. The evidence in the warrant application established probable cause that Orozco was running drug money when arrested. And it shows that he was using his cellphone for navigation at the time. That is enough, without even considering

Orozco's attempt to destroy other electronic evidence, to find the magistrate judge had ample reason to believe that Orozco's phone would contain evidence of a drug-trafficking conspiracy.[8]

Orozco admits that his argument is weaker as to the smartphone than the SD cards, but it largely proceeds in like manner:  The warrant application must contain the "magic incantation" that the officer's training and experience reveals that drug-trafficking data is often kept on cellphones.  As we have already discussed, warrant applications are commonsense documents, not Wiccan rituals, so no magical incantations are necessary. But Orozco responds that, without this boilerplate phrase, there is no basis in the affidavit for believing that drug-trafficking evidence would be on the cellphone.  The problem with that argument is that the officers didn't just suspect that the phone might have information about the crime, they observed Orozco using the phone to commit it.  The affidavit states: "Deputy D.L. Lucas then asked David Sierra Orozco where he was driving too [sic], upon being asked, David Sierra Orozco had the GPS on his cell phone open and he immediately closed out the GPS application."  J.A. 41.  So the affidavit did not need to rely on

---

[8] It is not altogether clear from the record whether admissibility of the photographs found on the phone turns on the adequacy of the warrant being challenged here.  The smartphone was apparently searched under the third warrant, which Orozco does not directly challenge.  That warrant issued only after child pornography was found on the SD cards.  And since we have already concluded that the police could search the SD cards, the third warrant would not be fruit of the poisonous tree.  *See United States v. Seerden*, 916 F.3d 360, 364–65 (4th Cir. 2019) (holding that evidence obtained from a second search warrant that "relied upon evidence found during the first search" was admissible because the first search was lawful).  So whether the first warrant would have hypothetically also justified the phone's search would not matter.  But the government has not made this argument, and it prevails even assuming the first warrant's validity is dispositive.

generalities of where *ordinary* drug traffickers *ordinarily* keep drug-trafficking evidence. It had something better: evidence that *this* suspected drug trafficker had evidence of *this* drug-trafficking crime (i.e., the destination of the cash) on his phone. That evidence supplied a substantial basis for finding probable cause to search the phone.[9]

---

[9] While sufficient, it is unclear if the open GPS application is necessary to establish a nexus between the cellphone and suspected crimes. "[W]e long have held that an affidavit need not directly link the evidence sought with the place to be searched." *Jones*, 942 F.3d at 639. "Instead, the nexus requirement also 'may be established by the nature of the item and the normal inferences of where one would likely keep such evidence.'" *Id.* (quoting *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988)). In *Anderson*, a magistrate issued a warrant to search a murder suspect's home for the murder weapon. 851 F.2d at 728–29. Anderson challenged the warrant because "the affidavit submitted . . . contained absolutely no facts or conclusions" that the weapon would be found in his home. *Id.* Rebuffing that argument, we held that because one would expect a person to keep a gun at their home, a magistrate judge could reasonably believe that searching the home might uncover the gun. *Id.* at 729 (citing *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975) (holding that it is reasonable to assume that individuals keep guns at their homes)); *see United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (holding that it is reasonable for an issuing magistrate to conclude that a drug dealer's residence would contain evidence of their crimes). In other words, there are places so intrinsically part of a person's daily life that one would expect evidence of their crimes to be found there.

Though smartphones were decades away at the time of *Anderson*, the Supreme Court has since noted that searching one's smartphone is like searching his home. *See Riley v. California*, 573 U.S. 373, 395–97 (2014). Much like homes, cellphones contain "a digital record of nearly every aspect of [their owner's] lives—from the mundane to the intimate." *Id.* at 395. A phone will often contain the suspect's "Internet browsing history, a calendar," "photographs labeled with dates, locations, and descriptions," a "record of all his communications" with various associates, and location information allowing one to "reconstruct [his] specific movements down to the minute." *Id.* at 394–96. The all-encompassing information on cellphones explains why unconstrained warrantless cellphone searches, like warrantless home searches, contravene the Fourth Amendment. *Id.* at 401. But it is also why phones "can provide valuable incriminating information about dangerous criminals." *Id.* So just as it is sometimes reasonable to believe that a suspect's home may contain evidence of their crimes, it might be reasonable to believe that his cellphone will. *See Lindsey*, 3 F.4th at 39–40. At least this might be true for crimes like drug trafficking that involve coordination. *See Riley*, 573 U.S. at 401 ("Cell phones have become important tools in facilitating coordination and communication among members (Continued)

14

\*            \*            \*

This case presents a model example of a proper investigation under the Fourth Amendment.  The officers submitted a comprehensive affidavit with detailed facts showing drug trafficking.  The magistrate combined those facts with commonsense inferences and determined that probable cause existed.  And when the officers discovered evidence of other crimes, they immediately went back and obtained additional warrants to search and seize those files.  The district court's denial of Orozco's motion to suppress was proper, and its judgment is

AFFIRMED.

---

of criminal enterprises . . . .").  But because there is direct evidence establishing a nexus here, we need not decide the reasonableness of such an inference.