**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4172**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES TIMOTHY COBB,

Defendant - Appellant.

_____

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA,

Amici Supporting Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. Irene M. Keeley, Senior District Judge. (1:18-cr-00033-IMK-MJA-1)

Submitted: June 1, 2020                                 Decided: August 11, 2020
                          Amended: August 17, 2020

Before WILKINSON and FLOYD, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Traxler wrote the opinion, in which Judge Wilkinson joined. Judge Floyd wrote a dissenting opinion.

L. Richard Walker, Senior Litigator, Clarksburg, West Virginia, Kristen Leddy, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant.  William J. Powell, United States Attorney, Sarah E. Wagner, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.  Nathan Freed Wessler, Brett Max Kaufman, Ezekiel Edwards, Jason D. Williamson, New York, New York, Jennifer Granick, ACLU FOUNDATION, San Francisco, California; Loree Stark, ACLU OF WEST VIRGINIA FOUNDATION, Charleston, West Virginia, for Amici American Civil Liberties Union and American Civil Liberties Union of West Virginia

TRAXLER, Senior Circuit Judge:

Defendant James Timothy Cobb ("Cobb") entered a conditional guilty plea to possession of child pornography. He appeals the district court's denial of his motion to suppress the images that were seized from his computer pursuant to a search warrant issued by a state magistrate judge. For the following reasons, we affirm.

I.

On September 7, 2014, Cobb, who was 57 years old at the time, was living with his parents, James and Freda Cobb, and his cousin, Paul Dean Wilson, in Marion County, West Virginia. A fight broke out that evening between Cobb and Wilson. Cobb put Wilson in a chokehold and put his knee in Wilson's chest. The fight was witnessed by Cobb's parents, who called 911 for assistance. Wilson was unresponsive when police arrived, and he was pronounced dead at the scene by emergency medical personnel. Cobb was arrested and jailed that evening, charged with the second-degree murder of Wilson.

Unbeknownst to Cobb's parents, the phone line remained open after the 911 calls were placed. The parents were recorded begging Cobb to stop, and telling Cobb that Wilson was "helpless," and he was "going to end up killing the man." J.A. 54. During questioning later by law enforcement, Cobb's parents gave varying accounts of the events leading up to the murder. Cobb's father said the fight started over Wilson's firearm. The father also said that Wilson threatened him and his son stepped in to protect him. The mother, on the other hand, told the officers that Wilson punched her in the mouth because she yelled at him for being mean to his cat, and that her son was protecting her. In a recorded jail call on September 8, Cobb and his parents discussed the various versions of

3

the events. During the call, the mother told Cobb that she put cotton in her lip and took a picture, on the advice of a neighbor, to support her version.

On September 9, 2014, less than 48 hours after the murder, Cobb was recorded in another jail call telling his father to remove a laptop computer from the bed in Cobb's room and to "put it in his father's room 'to keep it safe.'" J.A. 163. Cobb told his father that "Wilson had previously used the computer and put some 'shit' on it," and Cobb requested that his father "'wipe down' or 'clean' the computer." J.A. 163. Cobb also told his parents to get his cell phone from the jail.

After consulting with the state prosecutor, the investigating officers obtained a search warrant to search Cobb's residence for "[a]ny and all firearms belonging to Paul Dean Wilson Jr., any and all laptop computers, including tablets or desktop computers belonging to or operated by James Timothy Cobb, any and all cell phones belonging to or operated by James Timothy Cobb, and any and all evidence of a crime." J.A. 36. The probable cause statement reads as follows:

> On 09/07/14, at approx. 2355 hrs [d]eputies responded to an altercation at [Cobb's home]. Once on scene deputies advised that a male subject was unresponsive and started CPR. Once the undersigned arrived on scene the male subject, identified as Paul Dean Wilson Jr., was pronounced dead by EMTs. The undersigned then spoke with witnesses in the residence, James K. Cobb and Freda Cobb, who advised a physical altercation had taken place between James Timothy Cobb and his cousin Paul Dean Wilson Jr. During the altercation between James T. Cobb and Wilson, James T. Cobb placed Wilson in a choke hold and placed his knee on his chest and pulled his head towards his knee. . . . When deputies arrived on scene James T. Cobb still had Wilson restrained and Wilson was unresponsive. On 09/09/14 statements were made by James Timothy Cobb requesting his parents, James Keith Cobb and Freda Cobb, have a subject clean off his laptop and pick up his cellular telephone from the jail. Also upon speaking with James K. Cobb he advised that Paul Dean Wilson Jr. had possession of a hand gun he called

4

a "Beretta" and started the altercation over the firearm not being where Mr. Wilson left the gun. The above events occurred in Marion Co. WV.

J.A. 36, 38. The investigating officers executed the warrant and seized, among other things, three firearms and a Gateway laptop computer believed to be the computer that Cobb referred to in the phone call with his father.

On September 23, 2014, the officers obtained a second warrant to search the internal contents of the Gateway laptop computer for evidence of the murder. The probable cause statement included in this warrant reads as follows:

> On September 7, 2014[,] the Marion County Sheriff's Dept. responded to a domestic altercation between James Timothy Cobb and Paul Dean Wilson Jr. who are cousins both living with Cobb's parents at [their residence] in Marion Co. Wilson was pronounced dead at the scene. Cobb was arrested and charged with second degree murder. After new evidence was discovered the second degree murder charge was dismissed and Cobb was [c]harged with first degree murder. . . . During the investigation Cobb's phone calls from the jail have been monitored. During one conversation Cobb was heard to tell his father to get the computer out of his room and put it in his father's room. He said there are some things on there that need to be cleaned up before anyone sees them. On at least two other occasions he made reference to his parents about never letting anyone borrow your electronic equipment. On September 16, 2014[,] the Marion County Sheriff's Dept. served a warrant on Cobb's residence . . . and seized the Gateway laptop computer reference[d] by James Timothy Cobb.

J.A. 40, 42. The warrant authorized the search of the Gateway laptop computer in evidence for:

> Any material associated with the homicide of Paul Dean Wilson Jr. stored internally on a Gateway laptop computer serial # NXY1UAA0032251C66F1601 dark gray in color belonging to or used by James Timothy Cobb. Any and all other evidence of any other crimes.

J.A. 40.

5

When the executing officer began to open the computer files, he quickly discovered pornographic photos of underage females in various stages of undress and engaged in sexual acts. The officer immediately stopped the search, again consulted with the state prosecutor who concurred that the pornographic images were of prepubescent females, and sent the computer to the West Virginia State Police Digital Forensic Lab. In a follow-up interview with Cobb's parents, "[n]either one of them seemed shocked that there [were] pornographic images of underage females on their son's computer," and "[t]hey both immediately blamed [Wilson] for the images being on there." J.A. 68.[1]

As noted above, Cobb was initially charged with second-degree murder, but the charges were upgraded to first-degree murder due, in part, to the 911 calls and the inconsistent stories relayed to the officers by Cobb's parents. The officers later suspected that the child pornography was the motive for the murder. Months later, Cobb's cellmate told investigators that Cobb had admitted to killing Wilson because Wilson had discovered the child pornography on Cobb's computer and had threatened to turn him in to the authorities. Cobb ultimately pled guilty to second-degree murder and was sentenced to 20 years' imprisonment in state prison.

---

[1] According to the government, "Cobb's browsing history showed that his computer was used on at least 13 days in the month leading up to Mr. Wilson's death to search for and access child pornography, including every day of the seven days immediately preceding Mr. Wilson's death. On the dates and times that the child pornography found on Mr. Cobb's computer was downloaded, Mr. Cobb was logged in under his name and/or his known aliases on Facebook and Yahoo from the same IP address." J.A. 200-01 (footnote omitted). Cobb does not challenge these assertions on appeal.

On May 1, 2018, a federal grand jury indicted Cobb for possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). Cobb moved to suppress the child pornography found on the computer during the murder investigation. He argued that the warrants were unsupported by probable cause as required by the Fourth Amendment to the United States Constitution. In a supplemental pleading, Cobb asserted that the second warrant was also invalid under the Fourth Amendment because it lacked the requisite particularity.

The federal magistrate judge recommended that the district court grant in part and deny in part the motion to suppress. He concluded that both warrants were supported by probable cause to believe that evidence of the murder was contained on the computer, and that the first search warrant was sufficiently particular to satisfy the Fourth Amendment. With regard to the second search warrant, he concluded that the constitutional sufficiency of the warrant was not affected by the superfluous "any and all evidence of any other crime" phrase contained at the end of the warrant, but that the motion to suppress should be granted because the balance of the second warrant was insufficiently particular to satisfy the Fourth Amendment. The magistrate judge also recommended that the district court reject the government's request that the court apply the good-faith exception to the exclusionary rule, recognized by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). The government filed objections to the magistrate judge's conclusions that the second warrant was not sufficiently particular and that the good-faith exception was inapplicable. Cobb responded, but filed no objections to the magistrate judge's other recommendations.

7

The district court adopted in part and rejected in part the magistrate judge's recommendation and denied the motion to suppress. The court adopted the magistrate judge's conclusions that both warrants were supported by probable cause to believe that evidence of Wilson's murder would be found on the computer, and that "the constitutional sufficiency of both warrants was not affected by the superfluous language each contained," J.A. 239. Neither conclusion had been objected to by Cobb.

However, the district court rejected the magistrate judge's recommendation that the balance of the second warrant be found lacking in the requisite particularity. The warrant was sufficiently particular under our precedent, the district court reasoned, because it identified the specific illegal activity under investigation—the murder of Wilson on September 7, 2014. Relying on our precedent in *United States v. Williams*, 592 F.3d 511 (4th Cir. 2010), the district court also held that the child pornography was admissible under the plain-view exception to the warrant requirement. In the alternative, the district court held that the child pornography was admissible under *Leon*'s good-faith exception to the suppression rule.

Cobb thereafter entered a conditional plea of guilty to the child pornography charge, reserving the right to appeal the district court's ruling on the motion to suppress. He was sentenced to 110 months in prison, to be served concurrent with the remainder of his 20-year state sentence for second-degree murder, followed by a 10-year term of supervised release.

II.

8

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause exists when, "given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). "Unlike the probable cause requirement, which concerns the showing made by an officer *seeking* a search warrant, the particularity requirement is focused as well on the officer *executing* a warrant, and ensures that the search 'will be carefully tailored to its justifications' rather than becoming a 'wide ranging exploratory search[]' of the kind the 'Framers intended to prohibit.'" *United States v. Blakeney*, 979 F.3d 851, 861 (4th Cir. 2020) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).

On appeal, Cobb does not challenge the district court's determination that both warrants were supported by probable cause to believe that evidence pertinent to the murder of Wilson would be found on Cobb's computer. Nor does Cobb contend that the first warrant was insufficiently particular. Rather, he limits his challenge to a claim that the second warrant was not sufficiently particular because it was not "tailored to the facts presented to the police about the homicide," and failed to explain "the types of files sought, the location of the files, the timeframe or the relationship between the files and information about the homicide." Brief of Appellant at 11. When reviewing a district court's denial of a motion to suppress, "we review the district court's legal conclusions *de novo* and its

9

factual findings for clear error." *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009).

A.

It is well-settled that the Fourth Amendment "does not set forth some general 'particularity requirement.'" *United States v. Grubbs*, 547 U.S. 90, 97 (2006). So long as there is probable cause to believe that "contraband or evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 238, the Fourth Amendment "specifies only two matters that must be 'particularly described' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" *Grubbs*, 547 U.S. at 97 (alteration omitted); *see also Blakeney*, 949 F.3d at 862.

"As always, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (quoting *Fernandez v. California*, 571 U.S. 292, 298 (2014)). "When it comes to particularity, we construe search warrants in a 'commonsense and realistic' manner, avoiding a 'hypertechnical' reading of their terms." *Blakeney*, 949 F.3d at 862 (quoting *Williams*, 592 F.3d at 519). "[T]he test for the necessary particularity is a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved. There is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981) (internal quotation marks and alterations omitted).

10

The circumstances that lead us to affirm the district court's decision in this case are straightforward. The officers had probable cause to believe that the computer seized during the search of Cobb's home contained evidence pertaining to Wilson's murder—largely because Cobb, within 48 hours of the murder, instructed his parents to remove the computer from his room and clean it because Wilson had recently used it. The warrant set forth the justification for the search of the computer in some detail. In addition to setting forth facts pertaining to the murder of Wilson by Cobb, and the charges that were brought both initially and as upgraded, the warrant also referenced "Cobb's phone calls from the jail" to his parents. J.A. 42.

> During one conversation Cobb was heard to tell his father to get the computer out of his room and put it in his father's room. *He said there are some things on there that need to be cleaned up before anyone sees them.* On at least two other occasions he made reference to his parents about never letting anyone borrow your electronic equipment.

J.A. 42 (emphasis added).

Clearly, these facts and circumstances amply provided probable cause to believe that evidence pertinent to Wilson's murder was located on the computer and that Cobb was seeking to destroy it—a point no longer in dispute. The challenged warrant, in turn, specified as much as it reasonably could have: (1) the place to be searched—the internal contents of the "Gateway laptop computer . . . belonging to or used by James Timothy Cobb," identified by a physical description and serial number as the one seized pursuant to the first search warrant; and (2) the things to be seized—the "material associated with the homicide of Paul Dean Wilson Jr.," which occurred during the "domestic altercation" at their shared home on September 7, 2014. J.A. 40.

11

We have long recognized that "[a] warrant need not—and in most cases, cannot—scrupulously list and delineate each and every item to be seized. Frequently, it is simply impossible for law enforcement officers to know in advance exactly what . . . records the defendant maintains or how the case against him will unfold." *Phillips*, 588 F.3d at 225; *cf. United States v. Dornhofer*, 859 F.2d 1195, 1198 (4th Cir. 1988) ("[W]e do not read the search warrant as a constitutional strait jacket: that only those items particularly described in a warrant may be seized without regard to the facts and circumstances of the particular case.") (internal quotation marks omitted).

Accordingly, "where a warrant does not *otherwise* describe the evidence to be seized, that gap can be filled, at least sometimes, if the warrant instead specifies the relevant offense." *Blakeney*, 949 F.3d at 862-63; *see also United States v. Dickerson*, 166 F.3d 667, 693-94 (4th Cir. 1999) (upholding warrant authorizing officers to seize "[e]vidence of the crime of bank robbery"), *rev'd on other grounds*, *Dickerson v. United States,* 530 U.S. 428 (2000); *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994) (upholding constitutionality of warrant that "confine[d] the executing inspectors' discretion by allowing them to seize only evidence of a particular crime"); *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986) (warrant authorizing the broad seizure of "address books, diaries, business records, documents, receipts" was sufficiently particular because it allowed the officers "to seize only evidence of a particular crime"); *United States v. Ladd*, 704 F.2d 134, 136 (4th Cir. 1983) (upholding constitutionality of warrant that limited the officers' seizure to "items . . . relating to 'the smuggling, packing, distribution and use of

controlled substances").[2] We hold that the district court correctly concluded that the search warrant challenged in this case was sufficiently particular because it too confined the executing officers' discretion by allowing them to search the computer and seize evidence of a specific illegal activity—Wilson's murder on September 7, 2014.

2.

Like the district court, we also reject Cobb's claim that, in addition to specifying the crime under investigation, the warrant should have *also* described the "types of files sought, the location of the files, the timeframe [and] the relationship between the files and information" that the police had about Wilson's murder. Brief of Appellant at 11. Cobb does not explain, in any meaningful way, exactly how the warrant *could* have specified the files that contained the evidence of murder. But even if it were true that the warrant *could* have been more specific, the Fourth Amendment simply did not demand that the warrant *be* more specific in this case.

The Supreme Court has "previously rejected efforts to expand the scope of [the particularity] provision to embrace unenumerated matters." *Grubbs*, 547 U.S. at 97; *see id.* at 97-99 (rejecting challenge to the particularity of an anticipatory warrant because the warrant did not include the conditions precedent to execution of the warrant); *see also Dalia v. United States*, 441 U.S. 238, 257 (1979) ("Nothing in the language of the

---

[2] In like vein, a warrant need not "*always* . . . specify the crime for which the executing officers may seek evidence" *United States v. Blakeney*, 949 F.3d 851, 862 (4th Cir. 2020) (emphasis added). "Particularity with respect to the criminal activity suspected is [also] not on that list" of things that the Fourth Amendment demands. *Id.*

Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed."). And, to the extent any question remained, this circuit recently made clear that "a warrant may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." *Blakeney*, 949 F.3d at 863. The warrant need not satisfy *both* criteria. *See id.*

To the extent Cobb's challenge speaks more to the requisite specificity as to the "place" to be searched when the "place" is a computer, it also fails. In *United States v. Williams*, we addressed a similar challenge to a warrant that authorized the search of a defendant's computer for evidence of specific crimes, during which the officers inadvertently discovered images of child pornography. In addressing the application of the plain view exception to the warrant requirement, we held that, so long as the Fourth Amendment's basic requirements of probable cause and particularity are met, the executing officers are "impliedly authorized . . . to open each file on the computer and view its contents, at least cursorily, to determine whether the file [falls] within the scope of the warrant's authorization—*i.e.*, whether it relate[s] to the designated . . . crimes." *Williams*, 592 F.3d at 521-22.[3]

---

[3] Cobb's argument that *Williams* does not apply because the ruling was based on the fact that the crimes being investigated were computer-based crimes does not avail him. Although the *Williams* court did hold that the child pornography seized was within the *scope* of the warrant, the court also held, in the alternative, that the evidence was admissible under the plain view doctrine because the officers were implicitly authorized to open, at (Continued)

14

Here, the warrant authorized a search of the specific computer that Cobb had asked his parents to retrieve from his bedroom, keep safe in their room, and "clean" because Cobb's victim had recently used it. It is true that the officers suspected the computer might contain evidence explaining *why* Cobb killed Wilson, and *whether* he planned to murder him, by suffocation or by other means. And it is arguable that the evidence of child pornography *was* the evidence of motive that Cobb sought to wipe from the computer. But, as the district court correctly observed, the officers had no way of knowing when they applied for the warrant exactly *what* the evidence was that Cobb sought to destroy, or *where* Cobb had placed the evidence on the computer. The officers had probable cause to believe that Cobb's computer contained evidence pertinent to Cobb's murder of Wilson on September 7, 2014, and that Cobb's parents were willing to lie, destroy evidence, and manufacture evidence to support the narrative that Cobb's murder of Wilson was defensive in nature. Accordingly, more specificity was not required under the Fourth Amendment, nor was limiting the scope of the computer search practical or prudent under the circumstances of this investigation.

In sum, even if the Fourth Amendment might require more specificity as to the place to be searched or the items to be seized in some computer searches, Cobb has failed to convince us that the Fourth Amendment demanded that the descriptions of the place to be searched and the things to be seized needed to be more specific in this case. At bottom, his argument boils down to the claim that, even though probable cause existed to believe that

---

least briefly, the computer files to locate the evidence of the specific crime referenced in the warrant.

incriminating evidence pertaining to the murder of Wilson was located on that computer, and that Cobb was seeking to destroy it, the police could not search the computer because the police could not *foretell* the murder evidence that was located on the computer or the location of that evidence within the contents of the computer. That is not what the Fourth Amendment demands.

B.

We also affirm the district court's ruling that the constitutionality of the warrant was unaffected by the superfluous language included at the end of the warrant. Although we agree that the phrase "[a]ny and all evidence of any other crimes," standing alone, is overbroad, it did not render the entire warrant invalid.

Under the severance doctrine, "the constitutionally infirm portion" of a warrant— "usually for lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted." *United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992). "This notion that a search conducted pursuant to a warrant held unconstitutional in part does not invalidate the entire search is signaled in cases stating that only those items seized beyond the warrant's scope must be suppressed." *Id.* "[T]he social gains of deterring unconstitutional police conduct by suppressing *all* evidence seized pursuant to a partially invalid warrant often are outweighed by the social costs occasioned by such an across the board ruling." *Id.; see also United States v. Sells*, 463 F.3d 1148, 1154-55 (10th Cir. 2006) ("In accordance with the purposes underlying the warrant requirement and the exclusionary rule, every federal court to consider the issue has adopted the doctrine of severance,

16

whereby valid portions of a warrant are severed from the invalid portions and only material seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible.") (footnotes omitted).

Although this court has not yet referred to the "severance doctrine" by name in a published opinion, we have applied it in similar circumstances. In *United States v. Jacob*, we agreed that "the general tail of [a] search warrant," which seemingly authorized a search for violations of *any* federal criminal law, did not defeat the otherwise sufficiently-particular portion of the warrant. *Jacob*, 657 F.2d at 51-52. "[C]onsistent with the standard of our circuit which seeks to avoid the suppression of evidence seized pursuant to a warrant because of 'hypertechnical' errors," we held that "a defective qualifying phrase will not defeat a warrant which is otherwise sufficiently specific." *Id.* at 52. Rather, "the challenged phrase should properly be treated as merely superfluous and falls within the 'practical margin of flexibility' afforded warrants in cases of this type." *Id.*

Since then, at least two panels of this court have recognized this severance doctrine in unpublished cases. In *United States v. Prince*, for example, we declined to invalidate a warrant which contained "broad boilerplate language authorizing seizure of every conceivable item without tying these items to the alleged crimes or circumstances of the case." 187 F.3d 632, 1999 WL 511003, at *6 (4th Cir. 1999).

> We have held that, in order to avoid the suppression of lawfully seized evidence, a warrant that properly identifies some items "will not be defeated by other ambiguous or conclusionary language" so long as the warrant was "sufficiently particularized with respect to the items seized." *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981). In other words a court will "sever" the too general portion of the warrant from the sufficiently specific portion. *See United States v. George*, 975 72, 79 (2d Cir. 1992).

17

*Id.* In such cases, "[t]he evidence obtained pursuant to the lawful portion of the warrant [is] rightly admitted [and] the remainder of the warrant, while too broad, provides no basis for reversal." *Id.* at \*7.

And in *United States v. Walker*, 403 F. Appx. 803, 805-06 (4th Cir. 2010), we held that, although the warrant at issue improperly authorized the seizure of items (controlled substances) that was not supported by probable cause, the offending phrase would be redacted and the balance of the warrant upheld.

> [A]bsent a showing of pretext or bad faith on the part of the police or the Government, the invalidity of part of a search warrant does not require the suppression of all the evidence seized during its execution. *See United States v. Fitzgerald*, 724 F.2d 633, 636-37 (8th Cir. 1983). Thus, even if the portion of the warrant permitting seizure of [controlled substances] is invalid, the Fourth Amendment does not require the suppression of anything described in the valid portions of the warrant or "lawfully seized [] on plain-view grounds, for example—during their execution." *Id.* at 637; *see also United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992) (holding that, where warrant as a whole is not invalid, a redacted warrant may justify a police intrusion, permitting admission of items found in plain view).

*Id.* at 806.

We agree with these applications of the severance doctrine, and hold that the challenged phrase "[a]ny and all evidence of any other crimes" in the warrant before us, while overbroad in isolation, was easily and properly severed from the balance of the warrant which, as we have explained, was sufficiently particularized. Rather than invalidate the entire warrant and require suppression of the evidence of child pornography found in plain view on the computer, "the challenged phrase [was] properly . . . treated as merely superfluous and falls within the 'practical margin of flexibility' afforded warrants in cases of this type." *Jacob*, 657 F.2d at 52.

18

Perhaps because this point is so well established, we also note that Cobb failed to properly preserve appellate review of it. The magistrate judge noted in his report and recommendation our holdings that such "generalizing" or "catch-all" phrases will not ordinarily invalidate an otherwise sufficiently particular warrant, J.A. 186, and ruled only that the first part of the warrant was *not* sufficiently particular. And because "[n]either party objected to [the magistrate judge's] conclusion that the constitutionality of [the] warrants was unaffected by the superfluous language included in [them]," the district court adopted the finding and ruled accordingly. J.A. 250. Cobb, therefore, failed to preserve appellate review of the substance of the magistrate judge's recommendation. *See Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017) ("A plaintiff is deemed to have waived an objection to a magistrate judge's report if he does not present his claims to the district court.") (internal quotation marks and alterations omitted). Moreover, although Cobb obliquely asserts in his opening brief that the catch-all phrase in the second warrant made the first part of the warrant "worse," Appellant's Brief at 11-12, he did not directly challenge the district court's ruling on the effect of the superfluous language, nor did he brief the issue in his opening brief to this court. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) ("As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered."); *see also Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals.").

C.

We also affirm the district court's application of the plain view doctrine to the evidence of child pornography. "Once it is accepted that a computer search must, by implication, authorize at least a cursory review of each file on the computer, then the criteria for applying the plain-view exception are readily satisfied." *Williams*, 592 F.3d at 522. The officer "has a lawful right of access to all files, albeit only momentary," and "when the officer then comes upon child pornography, it becomes immediately apparent that its possession by the computer's owner is illegal and incriminating." *Id.* (internal quotation marks and citations omitted).

Cobb's sole challenge to the district court's application of the plain view exception is based upon his argument that the warrant was not sufficiently particular and, therefore, that the officers could not have been lawfully present at the place where the child pornography was plainly viewed. In light of our ruling on the particularity of the warrant, we affirm the district court's determination that the child pornography was admissible under the plain view doctrine.

D.

Finally, we reject Cobb's belated request, supported by the ACLU's amicus brief, that we not follow our prior holding in *United States v. Williams*, and hold instead that ordinary principles of Fourth Amendment jurisprudence, including the plain view doctrine, should not apply to computer searches. In *Williams*, we rejected the defendant's nearly identical claim that "traditional Fourth Amendment rules cannot be successfully applied in th[e] context" of computer searches because computers "hold so much information, touching on virtually every aspect of a person's life," and that "a new approach is needed

20

for applying the Fourth Amendment to searches of computers and digital media." 592 F.3d at 517.

Even if Cobb had raised such a direct challenge below or in his opening brief, we are powerless to overrule the decision of a prior panel of this court. *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) (explaining the "basic principle that one panel cannot overrule a decision issued by another panel"). Nor would we reject *Williams'* application to the warrant in this case. As we have explained above, "[n]othing in the language of the Constitution or in [the Supreme] Court's decisions interpreting that language suggests that, in addition to the requirements set forth in the text, search warrants also must include a specification of the precise manner in which they are to be executed." *Dalia*, 441 U.S. at 257. "On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant—subject of course to the general Fourth Amendment protection 'against *unreasonable* searches and seizures.'" *Id.* (footnote omitted, emphasis added); *see also Dickerson*, 166 F.3d at 694 ("[T]he law of this Circuit . . . allow[s] some discretion to the officers executing a search warrant, so long as the warrant at least minimally 'confines the executing officers' discretion by allowing them to seize only evidence of a particular crime.'" (quoting *Fawole*, 785 F.2d at 1144)). Reasonableness in the description of the place to be searched and the things to be seized is all that the Fourth Amendment demands,

21

and the warrant to search this computer, based upon the circumstances and the type of evidence sought in this case, was sufficiently particular in both respects.[4]

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[4] In light of our holding, we need not address the district court's alternative ruling that the *Leon* good faith exception applies. *See United States v. Leon*, 468 U.S. 897 (1984).

FLOYD, Circuit Judge, dissenting:

I disagree with my colleagues in the majority as to the constitutionality of the search warrant that authorized the search of the laptop. For the reasons explained herein, I would hold that the search warrant was unconstitutional for lack of particularity as to the items to be seized, that the government cannot rely on the plain-view exception for the seizure of the child pornography found on the laptop, and that the good-faith exception to the exclusionary rule does not apply. As a result, I would hold that the district court erred and that the child pornography should be suppressed.

## I.

## A.

In September 2014, James Cobb was living with his parents, James Keith Cobb (Cobb Sr.) and Freda Cobb (Ms. Cobb), near Fairmont, West Virginia. Cobb's cousin, Paul Dean Wilson, also lived at the home.

On September 7, 2014, a feud occurred between Cobb and Wilson. By the end of this family feud, Cobb had suffocated Wilson to death. During a 911 call made at the time of the altercation, Ms. Cobb was heard telling her son: "he's helpless" and "you['re] going to end up killing the man." J.A. 54. Cobb was subsequently charged with second-degree murder.[1]

---

[1] The charge was later upgraded to first-degree murder. However, as discussed below, Cobb eventually pleaded guilty to second-degree murder.

23

In the course of the murder investigation, three conflicting stories emerged as to what started the altercation between Cobb and Wilson. Cobb told investigators that the fight started because Wilson's firearm was not in the place where he had left it. However, Cobb's parents gave different accounts. Cobb Sr. told investigators that the fight started because Wilson was threatening Cobb Sr. and Cobb stepped in. By contrast, Ms. Cobb claimed that the fight started because Wilson was mean to his cat and, when Ms. Cobb told Wilson to stop, Wilson punched her in the mouth, prompting Cobb to step in.[2]

A couple of days after the killing, on September 9, 2014, Cobb told Cobb Sr. in a recorded jail call to get his laptop out of Cobb's bedroom and put it in his room "to keep it safe," and that he should "clean" it. J.A. 163. In this phone call, Cobb stated that Wilson borrowed the laptop and that he had put some "shit" on it. J.A. 163.

On September 16, 2014, after listening to the recorded jail phone call, the police sought and obtained a search warrant for the home (the "first search warrant"). The search warrant stated that the following list of items were to be seized:

> Any and all firearms belonging to Paul Dean Wilson Jr., any and all laptop computers, including tablets or desktop computers belonging to or operated by James Timothy Cobb, any and all cellphones belonging to or operated by James Timothy Cobb, and any and all evidence of a crime.

J.A. 36.

---

[2] Notably, Ms. Cobb's account of the events was brought into question in a recorded jail telephone call. Ms. Cobb told Cobb that a neighbor had told her to put cotton in her lip and take a picture, and that she had heeded the advice and provided the picture to police.

On the same day, the police executed the first search warrant, seizing a Gateway laptop (the "laptop"), among other items.

On September 23, 2014, the police requested and were granted another search warrant to search the contents of the laptop (the "second search warrant"). The second search warrant authorized a search for:

> Any material associated with the homicide of Paul Dean Wilson Jr. stored internally on a Gateway laptop computer serial #NXY1UAA0032251C66F1601 dark gray in color belonging to or used by James Timothy Cobb. Any and all evidence of any other crimes.

J.A. 40. The probable cause statement in the second search warrant was as follows:

> On September 7, 2014[,] the Marion County Sheriff's Dept. responded to a domestic altercation between James Timothy Cobb and Paul Dean Wilson Jr.[,] who are cousins both living with Cobb's parents . . . in Marion Co. Wilson was pronounced dead at the scene. Cobb was arrested and charged with second degree murder. After new evidence was discovered the second degree murder charge was dismissed and Cobb was [c]harged with first degree murder. . . . During the investigation Cobb's phone calls from the jail have been monitored. During one conversation Cobb was heard to tell his father to get the computer out of his room and put it in his father's room. He said there are some things on there that need to be cleaned up before anyone sees them. On at least two other occasions he made reference to his parents about never letting anyone borrow your electronic equipment. On September 16, 2014[,] the Marion County Sheriff's Dept. served a search warrant on Cobb's residence . . . and seized the Gateway laptop computer referenced by James Timothy Cobb.

J.A. 40, 42.

When the executing officer, Sgt. Alkire, executed the second search warrant and began opening computer files, he stumbled upon photos of prepubescent girls.

On August 29, 2017, Cobb entered a plea of guilty to second-degree murder in state court in Marion County, West Virginia. He was sentenced to 20 years in state prison.

25

On May 1, 2018, a federal jury in the Northern District of West Virginia returned an indictment charging Cobb with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). On June 15, 2018, Mr. Cobb entered a plea of not guilty.

B.

On July 6, 2018, Cobb moved to suppress the evidence seized per the first and second search warrants. Relevant for purposes of this appeal, Cobb argued that the second search warrant allowing a search of the contents of the laptop was unconstitutionally broad in scope and "entirely lack[ed] particularity of the information or electronic files to be seized[,] . . . leav[ing] all of Mr. Cobb's personal information contained in the laptop at the unfettered discretion of the State." J.A. 94.

On July 19 and 23, 2018, a suppression hearing was held before a federal magistrate judge. The government called no witnesses. Cobb called two witnesses to testify: Sgt. Alkire, the attesting officer to the second search warrant, and Magistrate Cathy Reed-Vanata, the state magistrate who issued the second search warrant.

Sgt. Alkire described his role in the investigation, including that he assisted in executing the first search warrant and drafted and obtained the second search warrant. According to his testimony, Sgt. Alkire had previously applied for search warrants involving computers, including the internal contents of a computer, and that he drafted the second search warrant in the same manner that he had drafted such warrants in the past. Sgt. Alkire testified that he used the language "[a]ny and all evidence of any other crime" in nearly every search warrant that he had drafted because that was the way he had been taught to draft warrants. J.A. 114.

26

In obtaining the second search warrant, Sgt. Alkire testified that, although he did not show the county prosecutor, Pat Wilson, a copy of the warrant, he did confer with him in getting the warrant. Sgt. Alkire testified that the magistrate judge did not question the "any and all evidence of other crimes" language, and that in the approximately 100 search warrants that Sgt. Alkire had obtained with such language, no one had ever told him that he should not include the phrase. In fact, Sgt. Alkire testified that it was "pretty much standard practice for us. We — we do that on about every one and we've never been told otherwise." J.A. 146.

Having obtained the second search warrant, Sgt. Alkire returned to his office and, despite never searching a computer before, conducted the search of the laptop. He testified that he was mainly looking for "[p]hotographs and files" relating to suffocation or any other evidence that might shine light on the motive for the killing. J.A. 126. According to Sgt. Alkire, it did not "take very long" to find child pornography. J.A. 125. After he found a few photos of prepubescent girls in various stages of undress and engaged in sexual acts, he sent the laptop to the lab for further forensic analysis.

Magistrate Reed-Vanata testified she was not provided any other information regarding the investigation not contained in the four corners of the affidavit and that she did not ask any questions as that was not the "appropriate practice." J.A. 166. She also testified that the phrase "any and all evidence" was not new to her and had been proposed to her before in search warrants that she had granted. J.A. 166.

On August 24, 2018, the federal magistrate judge issued a report and recommendation concluding that the second search warrant lacked sufficient particularity

27

because it did not identify the items to be seized from the laptop. Further, the magistrate judge held that the *Leon* good-faith exception to the exclusionary rule did not apply and so the child pornography should be suppressed. *See United States v. Leon*, 468 U.S. 897, 923 (1984).

On November 10, 2018, the district court issued its decision adopting in part and rejecting in part the magistrate judge's report and recommendation. The district court held that the second search warrant was sufficiently particular. *United States v. Cobb*, No. 1:18CR33, 2018 WL 4907764, at *5 (N.D. W. Va. Oct. 10, 2018). Moreover, the district court held that even if the second search warrant was not sufficiently particular, the evidence would be admissible under the plain-view exception. *Id.* Further still, the district court held that even if the search violated the Fourth Amendment, the *Leon* good-faith exception to the exclusionary rule applied. *Id.* at *5–6. As a result, the district court denied Cobb's motion to suppress. *Id.* at *7.

Thereafter, on October 12, 2018, Cobb entered a conditional guilty plea to possessing child pornography, reserving his right to appeal the denial of his motion to suppress. Cobb was sentenced to 110 months of imprisonment (to be served concurrently with his state murder conviction) and 10 years of supervised release. This appeal followed.

II.

On appeal, Cobb raises three main issues. First, he contends that the second search warrant was unconstitutional for lack of particularity. Second, he contends that the plain-view exception to the Fourth Amendment's warrant requirement is inapplicable. Finally,

28

he argues that the government cannot rely on the *Leon* good-faith exception to the exclusionary rule.

This Court reviews factual findings in a suppression motion for clear error and the legal conclusions de novo. *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019).

A.

First, I turn to the issue of whether the district court erred in holding that the second search warrant was sufficiently particular. On appeal, Cobb argues that the second search warrant violated the Fourth Amendment's particularity requirement as it did not specify the types of evidence investigators were looking for on the laptop beyond evidence "associated with the homicide of [Wilson]." J.A. 40.

Under the Fourth Amendment, a warrant must "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This is referred to as the "particularity requirement." The Fourth Amendment and its particularity requirement sprung from colonial opposition to "indiscriminate searches and seizures conducted under the authority of 'general warrants'" known as writs of assistance. *Payton v. New York*, 445 U.S. 573, 583 (1980). Such writs of assistance gave customs officials "broad latitude to search houses, shops, cellars, warehouses, and other places for smuggled goods" imported in violation of British tax laws. *United States v. Wurie*, 728 F.3d 1, 3 (1st Cir. 2013); *see Stanford v. Texas*, 379 U.S. 476, 481 (1965). In a 1761 case challenging the use of such writs in Massachusetts, James Otis famously decried that writs of assistance were the "worst instrument of arbitrary power," as they placed "the liberty of every man in the hands of every petty officer." *Stanford*, 379 U.S. at 481.

29

The opposition to the use of writs of assistance was not a novel pushback against perceived government overreach. In fact, the struggle in the early years of this Nation against the use of writs of assistance was preceded by an "earlier . . . struggle against oppression which had endured for centuries" in England. *Id.* at 482. During the sixteenth, seventeenth, and eighteenth centuries, the Crown used general warrants in enforcing literature licensing and, later, in prosecuting seditious libel. *Id.* Such general warrants "typically authorized of all persons connected of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel." *Id.* at 482–83.

The resistance to such Government intrusion culminated in landmark English cases such as *Entick v. Carrington*. 19 How. St. Tr. 1029 (1765). John Entick was the author of a publication titled *Monitor or British Freeholder*. *Stanford*, 379 U.S. at 483. A warrant was issued naming him and his publication and authorizing his arrest for seditious libel and seizure of his "books and papers." *Id.* In executing the warrant, over the course of four hours the King's Messengers ransacked Entick's house, breaking open doors, locks, boxes, chests, and drawers; reading all of Entick's private papers and books; and carrying away many of Entick's papers. In the famous case, Lord Camden declared the warrant to be unlawful. "This power," Lord Camden stated, "so assumed by the secretary of state is an execution upon all the party's papers, in the first instance." *Id.* at 484 (citing *Entick*, 19 How. St. Tr. at 1064). "His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being

30

concerned in the paper." *Id.* (quoting *Entick*, 19 How. St. Tr. at 1064). After this case, the House of Commons "passed two resolutions condemning general warrants, the first limiting its condemnation to their use in cases of libel, and the second condemning their use generally." *Id.* The case of *Entick v Carrington* has been described by our Supreme Court as the "wellspring of the rights now protected by the Fourth Amendment." *Id.*

Considering this history, the Supreme Court has stated that the purpose of the particularity requirement is to make general searches "impossible." *Marron v. United States*, 275 U.S. 192, 196 (1927). A sufficiently particular warrant therefore avoids "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *see also United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) (stating that the particularity requirement precludes "officers from conducting fishing expeditions into the private affairs of others"). As this Court has stated: "The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010).

Here, the second search warrant authorized a search for "[a]ny material associated with the homicide of [Wilson] stored internally on [the laptop] . . . . Any and all evidence of other crimes." J.A. 40. The question is whether the limiting language that the material had to be "associated with the homicide" of Wilson made the warrant sufficiently particular. For the reasons explained below, I conclude that it did not.

The particularity requirement of the Fourth Amendment is "a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *United States v. Dickerson*, 166 F.3d 667 (4th Cir. 1999), *rev'd in part on other grounds*, 530 U.S. 428 (2000); *see also United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) ("[T]he breadth of items to be searched depends upon . . . the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate."); *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) ("The specificity required in a warrant varies depending on the circumstances of the case and the type of items involved. Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible.").

Here, at the time the second search warrant was issued, there were three different explanations for what prompted the altercation between Cobb and Wilson—namely, Wilson being unable to find his firearm, Cobb stepping in to protect Cobb Sr., and Wilson being mean to his cat and punching Ms. Cobb when she stepped in. Adding a possible fourth explanation to the mix, Sgt. Alkire knew, based on Cobb's recorded jail calls, that Wilson may have downloaded something on the laptop in the days before the altercation. At the suppression hearing, Sgt. Alkire testified that he was looking for evidence of motive that could help justify the first-degree murder charge and that he wanted to look at photographs, files, and searches about suffocations. As the federal magistrate judge concluded rightly: "All of this information could have been used to limit the search. The search warrant could have been limited to the files that were testified to by Sgt. Alkire at

[the] suppression hearing—internet searches about suffocations and files—with the addition of a time limit—that have been accessed and/or added within the previous two weeks (or some time limit)." J.A. 180. Although the authorities had some suggestions as to possible motives, they failed to cabin the search warrant to the facts known at the time. Instead, the second search warrant lacked any particularity beyond information "associated with the homicide" of Wilson. Sgt. Alkire could have limited—and, in my view, was constitutionally required to limit—the search based on the information known to authorities at the time. *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987) ("In light of the information available to the agents which could have served to narrow the scope of the warrant and protect the defendants' personal rights, the warrant was inadequate." (quoting *United States v. Klein*, 565 F.2d 183, 190 (1st Cir. 1977)).

It is true that this Court has recognized that, where a warrant does not sufficiently describe the evidence to be seized, the particularity "gap can be filled, at least *sometimes*, if the warrant instead specifies the relevant offense." *United States v. Blakeney*, 949 F.3d 851, 862–63 (4th Cir. 2020) (emphasis added); *see also id.* ("[A] warrant may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize."). However, the government and the majority's reliance on this line of cases is misplaced. *See* Maj. Op. 12–13; Gov't Br. 11–16. A warrant merely specifying the relevant offense only satisfies the particularity requirement when "a more precise description [is] not possible in the circumstances" *and* where the crime listed generates "quite distinctive evidence."

33

*Dickerson*, 166 F.3d at 674 (first quoting *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)). Neither of those preconditions are close to being satisfied here.

First, as discussed above, the government had information as to potential motives for the murder. In fact, Sgt. Alkire testified that he knew the general contours of the information he was seeking, namely, photographs, files, and searches about suffocations. Such information could have, and should have, been included in the warrant to provide a more "precise definition" of the evidence sought to be seized. *Id.* By way of example, the warrant could have authorized the search of recently downloaded files, recent search history, or communications between Wilson and Cobb.

Secondly, this is not a case in which the crime specified, the "homicide of [Wilson]," would allude to distinctive evidence. This is because there are no typical "tools of the trade" for murder, especially when the evidence sought is on a personal computer, which stores gigabytes of data, including documents, pictures, emails, videos, search history, instant messages, and the like.

*Dickerson* provides the best contrast with this case. In *Dickerson*, this Court held that a warrant for the search of a residence was sufficiently particular when it stated that the evidence to be seized was "evidence of the crime of bank robbery." 166 F.3d at 694. In doing so, we recognized that warrants identifying the items to be seized as "evidence of [a] [specific crime]" are sometimes upheld as constitutional "where a more precise description was not possible in the circumstances." *Id.* at 693 (second alteration in original) (citing *George*, 975 F.3d at 76). However, we explained that a warrant authorizing a search for evidence relating to "'a broad criminal statute or general criminal activity' such as 'wire

fraud,' 'fraud,' 'conspiracy,' or 'tax evasion,' is overbroad because it 'provides no readily ascertainable guidelines for the executing officers as to what items to seize.'" *Id.* at 694 (quoting *George*, 975 F.3d at 76). A warrant authorizing a search for evidence relating to a "specific illegal activity" such as "narcotics" or "theft of fur coats," by contrast, was "sufficiently particular." *Id.* Because we held that the specific crime of bank robbery was "specific illegal activity that . . . generates quite distinctive evidence," such as guns, masks, bait money, dye-stained bills and clothes, and carrying bags, we held the warrant in *Dickerson* adequately distinguished "between those items which are to be seized and those which are not." *Id.*

In this case, unlike search warrants pertaining to crimes involving narcotics, the "theft of fur coats," or bank robbery, the mere reference to first-degree murder when applied to a laptop does not readily make the evidence that is the subject of the warrant "reasonably subject to identification." *Id.* As a result, this is not a case where the particularity requirement is satisfied by merely referencing the charged offense.[3]

---

[3] Unlike the majority, I do not address our decision in *Williams* in the context of the particularity analysis. *See* Maj. Op. 14–15. In *Williams*, the search warrant specified that the following items were to be seized: "Any and all computer systems and digital storage media, videotapes, videotape recorders, documents, photographs, and Instrumentalities indicat[ive] of the offense of [harassment by computer in violation of Va. Code Ann. §18.2-152.7:1]." 592 F.3d at 515–16 (first alteration in original). In executing the warrant, officials found a DVD containing child pornography. *Id.* at 516. Williams moved to suppress the DVD, arguing that the warrant did not "authorize[] officers to view each file on the computer, but rather . . . authorized a search of *only those files* in his computer related to the designated state offenses." *Id.* at 518–19. In assessing whether the authorities exceeded the scope of the search warrant—a legal question distinct from whether a warrant is sufficiently particular—this Court held that the seizure of the child pornography was within the scope of the warrant. *Id.* at 520–21. In the alternative, the
(Continued)

In summary, in the course of their investigation the authorities had gathered enough information to provide a more precise definition of the evidence sought. The officers were required to use this information to limit the breadth of the search warrant. By failing to do so, they failed to cabin the search warrant to the facts known at the time. Instead, the warrant, as drafted, provided a general warrant to rifle through the entire contents of the laptop and failed to adequately distinguish "between those items which are to be seized and those which are not." *Id.* To countenance the current warrant would be to permit ill-defined fishing expeditions into the vast oceans of personal information stored on citizens' digital devices. For the above reasons, the second search warrant was facially unconstitutional for lack of particularity as to the items to be seized.[4]

B.

Even though the second search warrant was unconstitutional, I next consider whether the district court erred in holding that the child pornography evidence is

---

Court held under the plain-view exception, discussed below, that the officers had the authority to "open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization." *Id.* at 521. Even though this Court's decision in *Williams* gives law enforcement broad latitude under the plain-view exception to search the contents of a computer, it does not absolve them of their responsibility to obtain a warrant that satisfies the Fourth Amendment's particularity requirement.

[4] Given that I hold the operative parts of the warrant are invalid, unlike my colleagues, I do not reach the additional question of whether the superfluous phrase "[a]ny and all evidence of any other crimes" can be severed from the rest of the warrant. *See* Maj. Op. 16–19. Excising such a phrase would not save the warrant.

nevertheless admissible under the plain-view exception. For the reasons explained below, I conclude that the plain-view exception is inapplicable.

As a general rule, warrantless searches or seizures are per se unconstitutional. *Williams*, 592 F.3d at 521. However, the Supreme Court has recognized "a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is that "under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion). Under the plain-view exception, police may seize evidence during a lawful search if: "(1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a lawful right of access to the object itself; and (3) the object's incriminating character [is] . . . immediately apparent." *Williams*, 592 F.3d at 521 (alteration in original) (quotation marks omitted). The exception is grounded in the rationale that when "police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

Here, the analysis begins and ends at first element. Although the first search warrant gave officers the lawful ability to seize the laptop, it did not give them the authority to search the laptop. That authority was purportedly conferred by the second search warrant, which, as discussed above, was facially unconstitutional. As a result, the officers did not have the lawful authority to search the laptop from which the alleged plain view occurred. In other words, when Sgt. Alkire was searching the laptop, he was not "lawfully present at

the place from which" the child pornography was viewed. *Williams*, 592 F.3d at 521.

Therefore, the evidence is not admissible under the plain-view exception.

## C.

Lastly, I turn to the question of whether the evidence is nonetheless admissible pursuant to the *Leon* good-faith exception to the exclusionary rule.

The suppression of evidence obtained in violation of the Fourth Amendment (called the "exclusionary rule") is not a remedy found in the Constitution but rather a "judicially created prescription for . . . a violation." *United States v. Seerden*, 916 F.3d 360, 366 (4th Cir. 2019); *see United States v. Calandra*, 414 U.S. 338, 347 (1974) (holding that the exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure"). The exclusionary rule is "primarily proscriptive" in that it is "designed to safeguard Fourth Amendment rights through its deterrent effect." *Seerden*, 916 F.3d at 366. For that reason, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

In *Leon*, the Supreme Court recognized a good-faith exception to the exclusionary rule, "under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (citing *Leon,* 468 U.S. at 922). Importantly, however, in *Leon* Court delineated several situations in which the

good-faith exception would *not* apply, including where, "depending on the circumstances of the particular case, [the warrant is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 668 U.S. at 923. Here, Cobb argues that the warrant was so facially deficient that no reasonable officer could presume it to be valid.

As discussed above, the second search warrant was facially overbroad in that it allowed for the search for "[a]ny material associated with the homicide of [Wilson]" on the laptop. The second search warrant failed to specify the categories of information sought on the laptop; instead, it merely referred to the homicide and did not adequately distinguish *ex ante* "between those items which are to be seized and those which are not." *Dickerson*, 166 F.3d at 693.

The fact that the second search warrant was facially deficient, however, is not the end of the good-faith inquiry. We must look to the circumstances of the case, as evidenced by *Leon*'s companion case, *Massachusetts v. Sheppard*. 468 U.S. 981, 987 (1984); *see also Dickerson*, 166 F.3d at 694 (stating that the inquiry depends "upon the understanding of a reasonable officer in light of the totality of the circumstances"). *Sheppard* involved a facially deficient warrant. But rather than categorically excluding the evidence, the Supreme Court examined the totality of the circumstances, including the officer's knowledge and actions as well as the officer's reliance on the statements of a district attorney and the judge who issued the warrant. 468 U.S. at 989. Although *Sheppard* involved a murder investigation, the officer used a form search warrant stating that controlled substances were the object of the search. The officer raised the issue with the

judge, and the judge assured the officer that he would make the necessary corrections to the warrant and that the warrant was valid. *Id.* at 995–96. Yet the judge failed to correct the warrant, and the officer failed to notice the error before executing the search. In holding that the evidence should not be suppressed for lack of particularity, the Supreme Court held that the officers had taken "every step that could reasonably be expected of them," *id.* at 989, and stated that it was "the judge, not the police officers, who made the critical mistake," *id.* at 990.

The Supreme Court again dealt with the *Leon* good-faith exception as it applies to facially deficient warrants in the case of *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). There, the Supreme Court affirmed the denial of summary judgment in a 42 U.S.C. § 1983 action to an officer who sought to rely on a search warrant in which he failed to particularize the items sought. The warrant in *Groh* merely described the respondent's two-story house, rather than the items—firearms—sought to be seized. *Id.* at 554. Contrasting the case with *Sheppard*, the Supreme Court in *Groh* stated that "because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid." *Id.* at 564. Ultimately, the Supreme Court held that the officer did not have qualified immunity because the warrant was so facially deficient. *Id.* at 565.

Turning to the circumstances of this case, unlike in *Sheppard*, there is nothing in the record that suggests Sgt. Alkire received express affirmation from the magistrate that the warrant was valid (other than, of course, her signature). Additionally, like in *Groh*, Sgt. Alkire prepared the warrant himself, without assistance from the magistrate, like in

40

*Sheppard.* To be sure, Sgt. Alkire consulted with the local county prosecutor, Pat Wilson, about the warrant. *See United States v. Clutchette*, 24 F.3d 577, 581–82 (4th Cir. 1994) (consultation with government attorney is relevant to a finding of good faith). But that fact does not weigh against suppression, as the government claims. *See* Gov't Br. 27. The record reveals that Mr. Wilson's involvement could generously be characterized as minimal, with Sgt. Alkire failing to even show him a copy of the second search warrant. Mr. Wilson's guidance as to the second search warrant was confined to simply insisting that Sgt. Alkire "[j]ust do it." J.A. 123.

Overall, the facts of this case are much closer to *Groh* than *Sheppard*. Here, Sgt. Alkire prepared an utterly facially deficient warrant without the strong reassurances by magistrates and prosecutors present in *Sheppard*. The second search warrant, which essentially provided for the indiscriminate rummaging through the contents of laptop, was "so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." *Leon*, 668 U.S. at 923. As a result, Sgt. Alkire's reliance on the warrant was not objectively reasonable. Therefore, the *Leon* good-faith exception to the exclusionary rule is inapplicable, so the child pornography should be suppressed.

III.

Justice Frankfurter observed that, though "criminals have few friends," the encroachment on the Fourth Amendment "reach[es] far beyond the thief or the blackmarketeer." *Harris v. United States*, 331 U.S. 145, 156 (1947) (Frankfurter, J., dissenting). The encroachment in this case could reach anyone with a computer. By failing to persist in our historical commitment to the particularity requirement in this context, I

41

believe that the majority further opens the door to unrestricted searches of personal electronic devices.  In today's modern world, such unrestricted searches are in many ways more invasive than the rifling of one's home.  Because "I cannot give legal sanction to what was done in this case without accepting the implications of such a decision for the future," *id.*, I respectfully dissent.